Golden Terra Mining Co. v. Smith et al.

1. STENOGRAPHER'S NOTES: LOSS OF. The destruction or loss of the testimony and proceedings of the trial, taken by the stenographer, does not of itself constitute a ground for a new trial.

2 SAME: NOT OFFICIAL: NO PART OF RECORD. The minutes of the stenographer taken at a trial, are not, in civil cases, official—form no part of the record, and

Golden Terra Mining Co. v. Smith et al

can only be made a part of the record in the cause by being incorporated into the bill of exceptions or statement of the case, and authenticated by the signature of the Judge, after settlement of the bill or case.

3. SAME: ONLY AN AID TO JUDGE IN SETTLING BILL. Whatever the stenographer may note down as the testimony or evidence received, or proceedings had, in civil cases, is not binding upon the Judge; but he must, in case of contention, settle the exceptions or case according to his own recollection, aided, however, if he can be, by his own notes and by the stenographer's.

4. MOTION FOR NEW TRIAL: BOTH LAW AND EQUITY CASES. By the Practice Act, affirmed by Act of Congress, one uniform mode of procedure is prescribed in actions at law and suits in equity. A motion for new trial is as requisite in the one case as in the other; and the same proceedings are necessary to preserve and bring into the record the evidence, to-wit: by a settlement of a bill of exceptions or statement of the case.

5. JUDGMENT: EQUITY: EVIDENCE NOT NECESSARY TO SUPPORT. The evidence adduced in an equity case is not requisite as a support to the decree or judgment.

6. RECORD: CONSISTS OF WHAT: HOW MADE. The record proper in an action tried upon issues of fact, whether in equity or at law, consists of the summons, the pleadings, the verdict if tried to a jury, the decision if tried to the court, and the judgment. All other proceedings, including the evidence adduced, must be brought into the record, if at all, by bill of exceptions or statement of the case, settled and signed by the Judge who tried the action, or by the Supreme Court, in the manner prescribed in the Code.

7. DIFFICULTIES OF PREPARING BILL OF EXCEPTIONS: NEW TRIAL NOT GRANTED BECAUSE OF. Where reasonable opportunity has been afforded the defeated party, as in this case. to prepare and have settled a bill of exceptions or statement, a new trial will not be granted simply because of the difficulties attending the preparation of the bill by reason of the destruction of the stenographer's notes.

8. SETTLING BILL: TESTIMONY RE-TAKEN WHEN LOST: COURT MAY ORDER. The District Court has power, in settling a bill of exceptions, and in enabling parties to prepare one, to cause the testimony to be re-taken; and for that purpose witnesses may be called to testify before the Judge or a referee for that purpose, and lost depositions may be re-taken.

9. NEW TRIAL: PROPERLY DENIED, WHEN PARTY NEGLECTED TO RESTORE EVIDENCE LOST. A new trial was properly denied where the party neglected to take any action toward restoring the evidence alleged to have been destroyed.

10. BILL OF EXCEPTIONS: TESTIMONY WHEN IMPROPERLY IN. It is not proper to set out the testimony at length in the bill of exceptions, when it is unnecessary to explanation of the objection stated.

11. INDIAN RESERVATION: TITLE TO LANDS IN. The decisions of this court in the cases of *U. S. v. McCall,* in *Uhlig v. Garrison,* and in *French v. Lancaster,* wherein it is held, that until February 28, 1877, Lawrence county was included

within the Sioux Indian Reservation, and that no title could be acquired or transferred to mining grounds and other lands therein situated until that date, adhered to

12 MINING GROUNDS: PARTY IN POSSESSION FEBRUARY 28, 1877: ADVERSE PRIOR LOCATION, INVALID. The right to acquire the title to the mining ground in controversy, it having had its inception on the 28th of February 1877, by reason of such reservation being then abrogated, and the District Court having found that on that day the defendants were in the exclusive possession of such mining ground, with the requisite discovery of a vein of valuable minerals thereon, and that they thereafter performed every act necessary to constitute and maintain a valid mining location, the plaintiff cannot recover any portion thereof by virtue of an attempted adverse prior location made before that date.

13. EVIDENCE: ACTS OF LOCATION BY DEFENDANTS PRIOR TO FEBRUARY 28, 1877: ERROR WITHOUT PREJUDICE Evidence having been received against plaintiffs' objection, of acts of location of defendants' mining claim done prior to February 28, 1877, in connection with the existence of the result of such acts on and after that date essential to a valid mining location, to-wit: the discovery within the limits of defendants' claim of a vein of gold-bearing ore, and the staking of the ground, which stakes still remain: *Held*, not to be error prejudicial to the plaintiff, the defendants claiming their right of possession by virtue only of what existed and was done by them in support and maintenance of their claim on and after that date.

14. SAME: FINDINGS OF FACT DISTINGUISHING BETWEEN ACTS PRIOR AND SUBSE· QUENT TO FEBRUARY 28, 1877: STRIKING OUT IMMATERIAL FINDINGS, ENOUGH REMAINS. By striking out and eliminating from the findings and decision all that relatea to acts done prior to the 27th of February, 1877, there still remain enough facts to entitle the defendants to maintain their right to the possession of the ground in controversy; and, therefore, the decision of the court below should be affirmed, notwithstanding evidence of such prior acts may have been immaterial, the cause having been tried to the court, and a clear distinction made both in the findings and conclusions, between such acts of location and their effect, before and after that date.

*Appeal from the District Court of Lawrence County.*

THIS was a controversy over a portion of mining ground claimed adversely by the parties to the action, their mining locations overlapping each other and including a fraction of each. The issues and facts appear in the pleadings, briefs of counsel and opinions. The opinions of the District Court are also given in full.

The diagram will illustrate the ground in controversy:

The plaintiff in its complaint, states its cause of action as follows :

I.   That plaintiff is a corporation duly organized and existing under and by virtue of the laws of the State of California, and doing a mining and milling business in Lawrence county, Territory of Dakota, in conformity with the laws thereof.

II.   Plaintiff further alleges, that on the 23d day of January, A. D. 1878, it was, and long prior thereto, its grantors and predecessors in interest, had been, and from thence hitherto it has been, and now is, the owner of, and in the lawful possession of the following described mining property, situate, lying and being in Whitewood Quartz Mining District, Lawrence county, Dakota Territory, and being that portion of the "Ophir" lode, ledge or mining claim, bounded as follows, viz :   Commencing at corner No. 1, a porphyry rock, from which locating monument No. 4, on mineral point, bears south 16 deg. 30 min. east 1,940 feet distant.

First course, north 41 deg. 7 min., west 789 feet to corner No. 2, a quartzite rock ; thence (second course) north 44 deg., west 61 feet to corner No. 3, a quartzite rock ; thence (third course) north 45 deg. 45 min., east 280.8 feet to corner No. 4, in quartz-mill ; thence, (fourth course) south 39 deg. 23 min.. east 852.4 feet to corner No. 5, a pine post ; thence (fifth course) south 45 deg., 45 min., west 255.3 feet to rock, and mound for corner No. 1 and place of beginning.   Containing 5 19-100th acres.   All courses variation 15 deg. east.

III.   Plaintiff further alleges that the said defendants claim an estate or interest in the southeasterly two hundred feet of the said above described mining premises, adverse to this plaintiff.

IV. That the claim of said defendants is without any right whatever, and that the said defendants have no estate, right, title or interest whatever in said mining ground or premises, or any part thereof.

And, for a further and separate cause of action, for the purpose of obtaining equitable relief in the premises, this plaintiff alleges :

I.   That on the 7th day of June, A. D. 1876, H. C. Harney, Moses Manuel, Fred. Manuel and Alex. Engh, discovered a valuable lode of gold-bearing ore on the southerly side of Bobtail Gulch, in Whitewood Quartz Mining District, Lawrence county,

Dakota Territory, and thereupon located the same by placing a notice thereon, claiming 750 feet southeasterly, and 750 feet northwesterly from said notice, and 150 feet on each side thereof; giving the date of discovery and location, and the names of the locators; and giving to the claim so located the name of the "Ophir" ledge, and marking the boundaries thereof, on the ground, by stakes and monuments, so that the same could be readily traced, and as hereinbefore described in metes and bounds. And by causing the said notice to be recorded in the office of the recorder of Whitewood Quartz Mining District, in said county and Territory, on the 13th day of June, A. D. 1876, and that within one year from the date of such discovery, said locators caused more than one hundred dollars in value of work and labor to be performed on said "Ophir" claim, and that they and their grantees have, since the date of said discovery and location, been in the lawful possession of the said mining claim.

II.   This plaintiff further alleges that it became the owner of the southeasterly 850 feet of said "Ophir" lode, by 300 feet in width, on the 23d day of January, A. D. 1878, by purchase, and that it has ever since been in the lawful possession thereof, claiming and working the same, and that it and its grantors have expended more than five thousand dollars in developing the said mining property.

III.   That said mining ground is only valuable for the gold and other precious metals therein contained; that the said defendants have unlawfully entered into the southeasterly 200 feet of the said "Ophir" lode, by means of a tunnel commenced without the lines of the said "Ophir" mining claim, and without the consent of the plaintiff or its grantors, and against its will have extracted and carried away large quantities of valuable gold-bearing ore therefrom, the property of this plaintiff, to-wit: about one thousand tons, of the value of about $7 per ton, and are now extracting and taking large quantities of valuable gold-bearing ores from the said "Ophir" mine, the property of this plaintiff, and threaten to continue to extract and take away further large quantities of said valuable gold-bearing ores from said premises, thereby doing irreparable injury to the said property and premises of this plaintiff, and plaintiff believes that unless said defendants are restrained by

Golden Terra Mining Co v. Smith et al

this honorable court, they will carry their threats into execution. Wherefore plaintiff prays:

I. That during the pendency of this action, the said defendants and each of them, and their agents, servants and employes, and each and every of them, may be enjoined from working upon, extracting or carrying away ores from—and from in any manner interfering with the said " Ophir " mining claim herein described, or any part or portion thereof, and that upon the final hearing the said injunction may be made perpetual.

II. That the said defendants may be required to set forth the nature of their claim, and that all adverse claims of the said defendants may be determined by a decree of this court.

III. That by said decree it be declared and adjudged that the defendants have no estate or interest whatever ,in or to said mining ground described herein, and that the title of this plaintiff to the whole thereof, be declared and adjudged good and valid.

IV. That the defendants, and each and every of them, be forever barred from asserting any claim whatever, in or to the said mining ground and premises, or to any part or portion thereof, adverse to this plaintiff.

V. And plaintiff prays for such other and further relief in the premises as to this honorable court shall seem meet and proper, and for its costs and disbursements in this action.

Which complaint the defendant answered, setting up the following defenses:

The defendants Alfred J. C. Mahler, Charles Spencer, Frank J. Norton, Julia A. Graham, Edward Davis, Geo. E. Huy, and Daniel W. Crooker, above named, by leave of the court first had and obtained, now make, serve and file this their amended answer to plaintiff's complaint herein. And answering said complaint said defendants deny each and every allegation therein, except as hereinafter admitted.

And defendants say that as to the allegations in said complaint, that plaintiff is a corporation duly organized and existing under and by virtue of the laws of the State of California, and doing a mining and milling business in Lawrence county, Territory of

Dakota, in conformity with the laws thereof, the said defendants have not any knowledge or information sufficient to form a belief, and so deny the same, and remand the plaintiff to its proof thereof.

I.   And said defendants deny that on the 23rd day of January, A. D. 1878, or at any time, plaintiff was, or from thence hitherto has been, or now is the owner of any part of the mining ground, lode, claim or premises described by metes and bounds in said complaint, embraced within the following described mining ground and premises, known as and called the Golden Terry Extension mining claim, viz:   Beginning at a post four inches square, marked northeast corner "Golden Terry Extension" lode corner No. 1, and run:   First course, south 52 deg. 45 min. west, ascend slope of ridge, at 150 feet discovery shaft and a stump six inches square marked "Discovery shaft," and also centre stake north end line "Golden Terry Extension," lode, at 300 feet a post four inches square marked northwest corner "Golden Terry Extension," corner No. 2; thence 2d course south 37 deg. 15 min. east, ascend along slope of ridge, at 225 feet a post four inches square marked "west side line centre stake Golden Terry Extension lode," at 425 feet a post four inches square marked southwest corner "Golden Terry Extension" lode, corner No. 3; thence third course north 52 deg. 45 min. east at 150 feet a pine post eight inches in diameter, marked "centre stake south end line Golden Terry Extension lode," at 300 feet a post four inches square marked southeast corner Golden Terry Extension lode," corner No. 4; thence fourth course, north 37 deg. 15 min. west descend along slope of ridge, at 200 feet a post four inches square marked "centre stake east side line Golden Terry Extension lode," at 425 feet to northeast corner, corner No. 1 and place of beginning.   From this corner the centre of the mouth of the tunnel of the Golden Terry Extension 115 feet long bears south 86 deg, 30 min. west 64 feet distant—containing an area of 3.00 acres, situate, lying and being in Whitewood Quartz Mining District, Lawrence county, Dakota Territory.

3.   And said defendants allege that the said "Golden Terra Extension" mining claim and ground embraces a portion of the southeasterly two hundred feet of said mining premises mentioned in said complaint.

4. And said defendants deny that on the 23d day of January, 1878, or at any time plaintiff was, or from thence hitherto has been, or ever has been, or now is in the possession, lawful or otherwise (except as hereinafter admitted) of any part of the mining ground, lode, claim or premises described by metes and bounds in said complaint, embraced within the above described "Golden Terry Extension" mining claim.

5. And said defendants deny that plaintiff's grantors or predecessors in interest, or any or either of them, long prior to the said 23d day of January, A. D. 1878, or ever at any time, have or had been the owners or owner of, or in the possession, lawful or otherwise, of any part of the mining ground, lode, claim or premises, described by metes and bounds in said complaint, embraced within the above described Golden Terry Extension mining claim.

6. And said defendants deny that they or any or either of them, ever claimed any estate or interest in, or entered into or had possession of any part of the premises described in the complaint herein, except that portion thereof embraced in the Golden Terry Extension mining claim hereinbefore described.

7. And said defendants admit and allege that at the commencement of this suit, and for a long time prior thereto, they the said defendants did have and claim an estate and interest in a certain portion of the southeasterly 200 feet of said premises mentioned in the complaint, viz: in that certain portion thereof embraced in the said "Golden Terry Extension" mining ground and claim hereinbefore described.

8. And said defendants allege that at the time of the commencement of this action, and for a long time prior thereto, said defendants were the owners of, and in the possession, and entitled to the possession of the said "Golden Terry Extension" mining claim, ground and premises hereinbefore described, and of that portion of premises described in the said complaint, and lying and being within the said "Golden Terry Extension" mining claim, ground and premises.

9. And said defendants allege that the grantors and predecessors in interest of the said defendants were the owners of, and in

the possession of, and entitled to the possession of said " Golden Terry Extension" mining ground and claim, and for a long time prior to the ownership and possession thereof by these defendants.

10. And said defendants deny that said claim of said defendants is without right, title or interest whatever in said mining ground or premises, or any part thereof described in said complaint, but allege that said defendants were, at the time of the commencement of this action, and for a long time prior thereto, the rightful and lawful owners of said " Golden Terry Extension" mining claim, and of that portion of the southeasterly two hundred feet of mining ground and premises described and mentioned in said complaint, and lying and being within said " Golden Terry Extension" mining claim.

11. And said defendants answering the further allegations for equitable relief in the said complaint, deny that on the 7th day of June, A. D. 1876, or at any time, H. C. Harney, Moses Manuel Fred Manuel and Alex. Engh, or any or either of them, located a valuable or any lode of gold bearing ores on the southerly side of Bobtail Gulch, in Whitewood Quartz Mining District, Lawrence county, Dakota Territory, by placing a notice thereon claiming 750 feet southeasterly and 750 feet northwesterly from said notice, and 150 feet on each side thereof, giving the date of discovery and location, and the names of the locators: and giving to the claim so located the name of " Ophir" ledge, and marking the boundaries thereof on the ground by stakes and monuments, so that the same could be readily traced, and by causing said notice to be recorded in the office of the recorder of said mining district, on the 13th day of June, A. D. 1876, or by any means or proceeding whatever.

12. And said defendants deny that said last named persons, or any or either of them, ever at any time prior to the location of the said " Golden Terry Extension" mining claim, marked the boundaries of the said alleged " Ophir" claim, upon the ground by stakes or monuments or otherwise.

13. And the defendants deny that the said plaintiff, on the 7th day of June, A. D. 1876, or at any other time, ever posted upon

the said "Ophir" mine or lode, or ever recorded, any location notice in accordance with law, or any location notice under or by virtue of which the said plaintiff ever acquired any rights in or to the said pretended "Ophir" mine or lode or any part thereof; and deny that said plaintiff ever posted or recorded any such location notice of said pretended "Ophir" mine or lode as in the said plaintiff's complaint mentioned and described, or any notice claiming 750 feet southeasterly, and 750 feet northwesterly, from said notice, or any part of said lode.

14. And said defendants deny that within one year from the date of the said alleged discovery of said alleged "Ophir" ledge, the said alleged locators thereof, or any or either of them, caused more than one hundred dollars in value of work and labor, or any work or labor whatever to be performed upon said "Ophir" claim. And said defendants allege that all the work and labor performed by said locators in that locality, in that year, was done on a certain mining claim known as and called the "Golden Terra."

15. And said defendants deny that plaintiff became the owner of the southeasterly 850 feet of said alleged "Ophir" lode, by 300 feet in width, or of any part thereof, on the 23d day of January, A. D. 1878, or at any time, by purchase or otherwise.

16. And said defendants allege that said "Ophir" claim mentioned in said complaint, is void and without any validity whatever.

17. And said defendants deny that they, or either, or any of them, unlawfully entered into the southeasterly 200 feet of the said "Ophir" lode, or into any part thereof by means of a tunnel or at all.

18. And said defendants deny that they or either of, or any of them, entered into said southeasterly 200 feet, or into any portion thereof, except that portion thereof embraced within the said "Golden Terry Extension" mining claim.

19. And said defendants deny that they, or either or any of them, by said entry, or by extracting and taking away ores or by any of the means alleged in the complaint herein, or by any means whatever, have done or are doing, any injury to any property or premises of plaintiff.

20.   Further answering said complaint, and as a counter-claim against said plaintiff, these defendants allege that at the commencement of this action, and for a long time prior thereto, they were the owners, and entitled to the possession of that certain quartz mining claim known as and called the "Golden Terry Extension" lode, hereinbefore mentioned and described, and that their grantees now are the owners of the same, which mining claim is situated between the summit of the divide between the North Fork of Gold Run, and the southeasterly end of the "Gopher" lode, on the south side of Bobtail Gulch, in Whitewood Quartz Mining District, Lawrence county, Dakota Territory, and is four hundred and twenty-five feet in length, by three hundred feet in width.   For that on the 20th day of August, 1876, one William S. Story, a grantor of part of these defendants, and the defendant Alfred J. C. Mahler, then being citizens of the United States, and the land whereon said "Golden Terry Extension" mining claim is situated, being unsurveyed mineral lands belonging to the United States, and was free and open to exploration for valuable mineral deposits, and to occupation, did enter thereon and discover a valuable gold-bearing vein or lode of rock, and did duly locate a quartz mining claim thereon of four hundred and twenty-five feet in length, in a southeasterly direction from the point of discovery, by a width of one hundred and fifty feet on each side of the center of the vein—caused the location notice thereof to be duly recorded, and caused work and improvements to be performed thereon, each year thereafter, of one hundred dollars or more, and duly complied with all laws relating to quartz mining claims in said district and territory; and that the defendants, Spencer, Norton, Davis, Huy and Graham, each deraigned title to an interest in said mine at the commencement of this action, from said Story, or said Mahler, by purchase of an estate and interest therein.

21.   And said defendants further allege that said Story and Mahler, after the 28th day of February, 1877, did duly re-locate said mining claim, and caused the location notice thereof to be duly recorded, on or about the 15th day of March, 1877, with the quartz mining recorder of said district, and afterwards, to-wit: about the 9th day of June, 1877, in the office of the register of

deeds, in and for said county, and that said Story and Mahler, and their grantees in interest, have remained continuously in undisputed possession of said "Golden Terry Extension" mining claim down to the present time.

22. Defendants further answering the complaint, and as a counter-claim against said plaintiff, allege, on information and belief, that prior to the date of the pretended "Ophir" lode location, there existed a valid quartz mining location called the "Golden Terra" lode, upon and covering very nearly all of the ground afterwards included within the surface boundaries of the said pretended "Ophir" location; that the so-called discovery of the pretended "Ophir" vein or lode, was made within the surface boundaries of the "Golden Terra" lode, about ninety feet inside of west side line, and was merely a development of said "Golden Terra" mining claim, and on lands already appropriated and located as the "Golden Terra" mining claim, which was then and always has been a valid and subsisting mining claim, and defendants allege that said pretended "Ophir" location is wholly invalid and of no effect.

23. Defendants further answering said complaint, and as a counter-claim against said plaintiff, allege, on information and belief that the plaintiff is estopped from asserting any estate, right, title or interest in the ground in controversy, in virtue of the said pretended "Ophir" lode location of June 7th, 1876, for that on or about the 30th day of July of that year the grantors in interest of said plaintiff, viz: Fred. Manuel, Moses Manuel, H. C. Harney and Alex. Engh, being desirous to have the ground adjacent and adjoining the "Golden Terra" lode, on the south, explored and developed, and a mining location made there, advised, induced and assisted said William S. Story and said Alfred J. C. Mahler, to make the "Golden Terry Extension" lode location, as they did, and took said Story and Mahler to the then southeasterly end line of the "Golden Terra" lode, and pointed out to them the ground now covered by the said "Golden Terry Extension" location, and stated and represented to said Story and Mahler that the same was free and open to exploration and occupation as a quartz mining claim; that the pretended "Ophir" lode had no value or validity as a mining claim and would in no wise affect or interfere with

them, and pointed out where they thought the vein or lode could be found below the surface of the ground, which is the place now marked by the discovery shaft of the "Golden Terry Extension" lode, the said Manuels, Harney and Engh representing and stating to said Story and Mahler at that time and place, that they would be benefitted by any location of a mining claim that said Story and Mahler might there make, as well as being a protection to their "Golden Terra" lode on that end, that the said Manuels, Harvey and Engh had full knowledge of the extent of the "Golden Terry Extension" lode location, and of its boundaries thus made as aforesaid by their solicitation and advice, and with their assistance at and after the same was made; and at no time made any objection, but frequently visited the workings thereon and encouraged said Story and Mahler to persevere in their workings, by assuring them while there that they had a valuable mining location in said "Golden Terry Extension" lode, and that the workings and developments being made by said Story and Mahler would prove of great benefit to them in establishing the continuation of the "Golden Terra" claim and enhancing its value to them.

Defendants further allege, that at the time of these statements and representations the said Fred. Manuel, Moses Manuel, H. C. Harney and Alex. Engh were owners of the "Golden Terra" lode, and of the pretended "Ophir" lode, and knew the true state of their own title to the same; that said statements and representations were made with the express purpose to influence said Story and Mahler to make the "Golden Terry Extension" location, and did so influence them that said Story and Mahler believed at the time that such statements and representations were true, and relied and acted directly upon the truth of the statements so made to them, and were destitute of all knowledge of the state of said Manuels', Harney and Engh's title to said pretended "Ophir" lode, except what was stated by them to said Story and Mahler, and these defendants will now be injured by allowing plaintiff to disprove the truth of said statements and representations, and is therefore equitably estopped from now setting up any claim to any part or portion of the ground in controversy in this action.

24.   Further answering said complaint, and as a counter-claim

against said plaintiff, defendants allege that said plaintiff nor its grantors, was at any time prior to the commencement of this action, in possession of the ground mentioned and described as the "Golden Terry Extension" lode, or any part or portion of the same; that the same had been at all times since its occupation and location as a mining claim by Story and Mahler in the actual possession of said Story and Mahler and their grantees, and that all grants of the same made by plaintiff's grantors are void.

25.   Further answering said complaint, and as a counter-claim against said plaintiff, these defendants allege that the pretended "Ophir" lode mining claim, on the 7th day of June, 1876, was on land to which the Indian title was not extinguished, and was, from the last mentioned date, down to the 28th day of February, 1877, within the limits of the Indian Reservation, commonly known as, and called the Sioux Indian Reservation, set apart by the treaty with the Indians, by the United States, ratified by the Senate of the United States and promulgated by the President, February 24th, 1869, and said plaintiff's grantors acquired no right or title to any part of said pretended "Ophir" lode location.

26.   Further answering said complaint, and as a counter-claim against said plaintiff, defendants allege that plaintiff pretends and claims to have some estate, right, title or interest in or to a portion of the "Golden Terry Extension" lode—that is, that portion of it in the northwesterly part about two hundred feet in length northwesterly and southeasterly by a width of about one hundred and fifty feet; that such pretence is false and fraudulent and tends to the manifest injury of these defendants, and casts a cloud upon the defendants' title, which ought to be removed.

27.   Defendants' further answering said complaint, and as a counter-claim against said plaintiff, allege that since the commencement of this action, to-wit:   On or about the first day of March, 1879, said plaintiff by its agents and servants has unlawfully entered upon a portion of said "Golden Terry Extension" lode, and has, and is, committing waste thereon, by mining and removing valuable gold-bearing ores therefrom.

Wherefore defendants pray, that it may be adjudged that the said plaintiff has no right, title or interest in or to the said afore-

mentioned and described "Golden Terry Extension" mine and lode, and that their pretended title thereto is null and void; and that the said title of the defendants to the said "Golden Terry Extension" mine or lode as hereinbefore mentioned and described, is and was a valid claim, entitling said defendants to each and every part thereof. And for such other and further relief as to the court shall seem meet and proper.

    [SIGNED.]         McLAUGHLIN & STEELE,
                              —— THORNTON,
                                 *Defendants' Attorneys.*

The plaintiff replying to the counter-claim contained in the amended answer of the defendants herein, denies each and every allegation of the amended answer respecting the same.

    [SIGNED.]         CORSON & THOMAS, *Attorneys for Plaintiff.*
A. M. HILLHOUSE, ESQ., AND W. H. CLAGETT, ESQ., *of Counsel.*

The District Court at the time of the filing of the findings of fact and conclusions of law read the following opinion and decision which pursuant to the order of the Court together with the findings of fact and conclusions of law, constituted his decision and were made a part of the records of the case.

DECISION OF THE COURT.—In addition to the formal findings of fact and conclusions of law filed in this case I have deemed it not unadvisable to present my views of some of the more important questions, both of fact and law involved, somewhat more at length than is necessary or appropriate in such formal findings. The absorbing character of my official duties since the trial have precluded an earlier determination of the case. Counsel are aware that until the fire in Deadwood, which occurred on the 26th of September, I was daily constantly engaged in the trial of causes in this, and in the United States District Court at Rapid, many of them of importance, requiring my whole attention, and that since the fire the time that I could devote to any one case has been very limited. I desired that my decision should at least be the result of mature consideration, both because of the import-

ance of the particular case and the novelty of some of the questions involved. The action was tried in July, at the February additional term of this court and consumed nearly four weeks, the testimony taken covering more than five thousand pages. I had the benefit of the learning and ability, not only of the experienced local counsel engaged, but also of able and distinguished gentlemen from the States of California and Nevada, whose large and varied experience in mining litigation rendered them capable of affording me great assistance.

This action was brought by the " Golden Terra " mining company, a corporation organized under the laws of California, transacting business and holding property in this Territory, against the defendants, Alfred J. C. Mahler and others, to recover about two hundred, by one hundred and fifty feet of what is known as the " Golden Terry Extension " mining claim, the plaintiff claiming by virtue of its ownership of what is known as the " Ophir " mining claim, which over-laps and includes a part of the " Golden Terry Extension." The suit is in the nature of an action to quiet the title and for an injunction. The defendants are engaged in working the ore at the upper level and the plaintiff is engaged in working the ore from the same vein or ledge at a lower level. The answer of the defendants, besides being a specific denial of the allegations in the complaint, also contains affirmative allegations, and a prayer for affirmative relief. It is unnecessary to state the issues in the decision, as the facts recited will be sufficient to illus_trate the questions I am required to pass upon.

The first question I propose to consider arises upon the following facts, which are substantially undisputed. On the 21st day of February, 1876, Fred Manuel, C. X. Harris and Alexander Engh, citizens of the United States, and otherwise qualified thereunto, in Bobtail Gulch, in what afterwards became the Whitewood Quartz Mining district, in Lawrence county, discovered a lode, or vein of gold bearing quartz rock in place, and proceeded to locate the same, under the mineral land laws of the United States. They located, claimed and staked a parcel of land embracing the discovery, seven hundred and fifty feet southwesterly,

seven hundred and fifty feet southeasterly, and one hundred and fifty feet each side from the point of discovery, and named their claim the "Golden Terra" lode. The locators in all respects conformed to, and complied with, the laws of the United States, of the Territory, and the local rules and regulations governing the possessory rights to such mining claims, and they and their grantees have at all times since, been in the actual, peaceable possession of said "Golden Terra" mining claim, claiming it under and by virtue of such original location, and at no time has there been any abandonment of said location, actual or intended, or any portion thereof (save a few feet upon the southerly end, when, upon a survey, it was found they had more than fifteen hundred feet in length included within the boundary stakes) but all the time, from the first location to the commencement of this action, the said "Golden Terra" mining claim has been a valid and subsisting location, so far as it could be made such, under the laws of Congress.

Subsequent to the 21st day of February, 1876, and prior to the 7th day of June, 1876, the said C. X. Harris sold and transferred to Moses Manuel and H. C. Harney, all his right and interest in the said "Golden Terra" mining claim, and they—Fred Manuel, Moses Manuel, H. C. Harney and Alex Engh—became and were the owners of said claim, and in the actual possession thereof, claiming the same for their own.

On the 7th day of June, 1876, while they were then in possession, and claiming the "Golden Terra" mining claim, Henry Engh and the Manuels, made what at the time they supposed was a discovery of another vein or lode of gold bearing quartz rock in place, about three hundred and fifty feet southerly from the first discovery, and within the limits of what was then, and has ever since been claimed by them and their successors in interest as the "Golden Terra" mining claim.

Subsequent developments have determined beyond doubt that such supposed new discovery was upon the same vein and body of ore as the first, and upon which the "Terra" location had been predicated.

Upon the making of such supposed new discovery, without

abandoning, or intending to abandon, any portion of the "Golden Terra" location, the parties put up a discovery notice, claiming seven hundred and fifty feet northwesterly, seven hundred and fifty feet southeasterly, and one hundred and fifty feet on each side from the point of discovery, and otherwise conformed to and complied with the laws of Congress, and the local laws, rules and regulations governing possessory title to such mineral lands. This second location they named the "Ophir." It will be seen by an examination of the plats on file in this case, that the "Ophir" is nearly all included within the exterior boundaries of the "Golden Terra" claim, leaving outside of such boundaries a strip along the westerly side of the "Terra" about sixty feet by eleven hundred and fifty feet, and upon the south and southwest a parcel about 300 by 350 feet. It is with regard to a part of this last named parcel, extending beyond the southerly end line of the "Golden Terra" that this controversy has arisen.

No other discovery, and no discovery of a vein in the "Ophir" outside the limits of the "Golden Terra" was made, and no work was done, or improvements made, until after the defendant's rights had accrued.

On the 27th day of January, 1877, the locators and owners of the "Golden Terra" and "Ophir" sold and transferred their rights and interests therein to Thomas F. Durbin and John W. Bailey by deed; describing them in this manner: "A certain gold bearing lode, lying and being between the north fork of Gold Run and Deadwood Creek, and crossing Bobtail Gulch on placer claim No. fourteen (14) and known as the 'Golden Terra' lode, as the same appears on the records in the office of the recorder of the Whitewood Quartz Mining District. Also a certain gold bearing lode, running parallel to and about one hundred feet from and southwest of the aforesaid 'Golden Terra' lode, as appears of record in the recorder's office aforesaid."

I have given this description at length because, while it is very indefinite, as to the "Ophir," I have admitted against defendants's objection, and considered evidence tending to show it was the "Ophir" that was intended to be conveyed in this instrument, and treat it as a conveyance of the "Ophir," and because I pro-

pose to consider further along, the effect of such description. For the purpose of further enforcing the views I have taken, that at no time was there any abandonment, or intended abandonment, of the "Golden Terra" location or any portion of it, or that any portion of it was intended to be included within the "Ophir," I add : the above named grantees, Bailey and Durbin, in June or July, 1877, after they had purchased, caused a survey of the "Ophir" to be made, and in that survey caused the exterior lines of the "Ophir" to be run only to the lines of the "Golden Terra," thus actually excluding in that survey, any part of the "Golden Terra."

I have, I think, stated sufficient facts, to present the question which meets us at the threshold of this case.

Can a legal and valid location be made, predicated upon a discovery of the existence of the same vein, already discovered at another place, within the limits of a valid and subsisting location, without an abandonment of any portion of such subsisting location ?

It is urged by the defendant's counsel, that inasmuch as the "Ophir " discovery, was within the limits of the "Golden Terra " mining claim, and upon the same vein ; and the attempted location was made by the then owners of the "Golden Terra," without abandonment of any portion of the first location, at that time, or since, that such alleged discovery was not a discovery of a vein at all, but a new development of one already discovered, and that a location predicated thereon gave them no additional rights; a further argument urged being that to hold such a location valid would, in effect, be nullifying the act of Congress limiting mining claims to fifteen hundred feet along the vein or lode, and to such width, not less than twenty-five feet nor more than three hundred feet on either side of the middle of the vein, as the local laws, rules and regulations should provide, and would allow parties to make locations, indefinite in length and width, predicated upon what is practically one discovery.

It is as confidently urged by the plaintiff's counsel, that inasmuch as the law of Congress does not limit the number of claims which any person, or a number of persons, may take, on any lode,

or in any district, that it is competent to base as many locations upon one discovery, or upon any number of discoveries, within an already subsisting location, as may be desired, the only condition being the otherwise compliance with the law, in marking the surface boundaries, doing the requisite amount of work, etc., etc.

Which of these propositions is the correct one? Is there anything in the law of Congress, or of the local laws, rules or regulations, preventing as many valid locations being made as a party may desire, predicated upon one discovery, or several discoveries, so-called, of the same vein, within the limits of the first, and yet subsisting location, and this, without any abandonment, actual or intended, at the time, or subsequent, of the first location?

It was after much hesitancy that I was able to come to a conclusion, satisfactory to myself, upon this question, and after careful consideration and thought. Plausible, and at first view almost conclusive reasons, can be, and upon the argument, were urged, upon either side. Counsel were unable to call my attention to a single adjudicated case, or opinion, from any source, that could serve as a precedent, or even as an illustration. It would seem that if there was anything in the proposition, it should have been the subject of judicial examination somewhere, but I was assured that the litigation in the older mining districts of the country, arising upon the validity of mining locations, was with regard to locations made prior to the Act of Congress of 1872, and of course no such question would be likely to arise under the former laws, or under the local rules and regulations in force before there was any law of Congress upon the subject.

Before addressing myself to this question, I desire to call attention to some further facts which appeared in the evidence, which may serve to illustrate the reason for this anomaly in the making of mining locations, as this certainly was. It appears from the evidence, that the parties making the location of the " Ophir " were conversant with the law as it stood prior to 1872, allowing the location of but one vein, and surface ground sufficient for the convenient working of the same, in the same location, and did not understand that their " Golden Terra " location would include and give them title to all other veins, the top or apex of which lay

within the side lines of their "Golden Terra" claim, as would be the case by the laws of 1872; hence they made the location of the "Ophir," supposing it to be a parallel vein, for the protection, as they termed it, of their "Golden Terra" vein.

This is further shown, and enforced, by the description contained in the deed to Durbin and Bailey, wherein, after describing the "Golden Terra," as a lode, and not as a location, or mining claim, and its situation, they add: 'also a certain gold-bearing lode, running parallel to, and about one hundred feet from, and southwest of the aforesaid 'Golden Terra' lode.'"

These descriptions and their actions, in thus locating the "Ophir" were perfectly consistent with the laws relating to similar locations in force prior to 1872. But the "Ophir" claim did not run parallel to, and about one hundred feet from the "Golden Terra" mining claim. Parts of both were included in the same boundaries, and the rest adjoined. Probably the locators were old miners, or had learned from old miners, conversant with the former laws, but not with the present.

However, I propose to consider this question from the standpoint of the legal effect of their acts, and not from what may have been the intention, or inferred intention of the parties.

In determining the validity or invalidity of the location, made under the circumstances of the "Ophir," in view of the law as it was at the time of the location of the "Golden Terra" and the "Ophir," I have first to determine what lands and property rights does the second location give the party the possessory rights to? I use the term lands, for in the law of 1872, incorporated into the United States Revised Statutes, it is the land containing valuable mineral deposits that is subject to occupation and purchase; it is the land to which the title is acquired by the proceedings specified in section 2,325.

What does such a location as the "Ophir" include? After as much thought as I have been able to give to this case, I have concluded to hold, and do hold, that it includes only so much of the described claim, as is exclusive of the "Golden Terra" exterior boundaries. Two valid and subsisting, perfect and complete, locations, cannot exist, covering the same ground at the same time.

While the first exists, all the rights possible for the party to acquire under the law, he already possesses by the first location. The second cannot give him any other, or additional rights. The title to that portion of the first, included in the second location, is in no way strengthened by such second location, so long as the first exists, complete in itself.

Let me illustrate: Supposing, instead of the possessory title inuring to him, by virtue of his own acts, under the law as it now does, the title, both possessory and otherwise, came to the locator by deed, from the government, and the taking effect of the grant, was the inception of the title, would a second deed give him any additional title or right? Supposing these locators had received from the United States a patent to the "Golden Terra" mining claim, and afterwards to the "Ophir," would the patent, granting that portion of the "Ophir," included within the "Golden Terra," have given them any further or higher title? Manifestly not. Such portion of the second grant would have been simply an idle act, a void grant, for the United States would have had therein nothing to convey.

Then, having acquired by the first location all the possessory rights which the law could give them to the land and mineral deposits therein included within the limits of the "Golden Terra" mining claim; by the second location, including a portion of the first, these locators acquired no further right to that portion, included within the first. Therefore, I think the legal effect of the "Ophir" location was to include no more of the lands and mineral deposits therein, than was included within the exterior limits of that location, outside of the exterior boundaries of the "Golden Terra" mining claim.

Having arrived at that conclusion, I am further of the opinion, and so hold, that the spirit and intent of the Act of Congress is to require, as a condition precedent to a location of a mining claim, that a discovery of a vein, bearing valuable minerals, shall first be made within the limits of such location, independent of any other subsisting and valid location.

It is the *unappropriated* public lands—the lands *belonging* to the United States, in which valuable mineral deposits are found, that

are open to exploration, occupation and purchase.  It is upon such lands mining claims can be located, and in such lands a vein must be first discovered.

Again: the maximum area of a mining claim is fixed by the law of Congress at fifteen hundred feet along the vein or lode, and six hundred feet in width, subject to a lesser limit, to be fixed by the local law, not less than fifty feet in width.   If one discovery can serve to authorize locations of claims indefinitely, a complete circle of claims may be predicated upon it, encircling it like the spokes of a wheel running from the hub, and thus a claim be made to extend in fact nearly three thousand feet in diameter by simply adding a few names and stakes and notices, and expending more money for labor and improvements.   For if one discovery, which is included within all the locations, will suffice, labor and improvements at one place thus included will also suffice.

If two or more assumed discoveries within the same original location, and upon the same vein, will authorize two or more locations to include additional ground, it follows logically that one will do equally as well.   If such is the true construction of the Act of Congress to thus allow indefinitely, locations based upon one or more discoveries in the same original location, then it opens the door to one of the very evils the law was intended to remedy, to-wit: such a monopoly of the public mineral lands by prospectors and speculators as would tend to prevent their speedy and effective development.   One person could by a single shaft at one place, prevent the lands being explored or developed for an area of 3,000 feet in diameter, and the minerals therein contained from being extracted and added to the wealth of the country.

I repeat, I think the spirit and intent of the law of Congress is to require a discovery of a vein of valuable mineral-bearing rock in each independent located claim.  A contrary view would, in my judgment, be against the policy of the law which was evidently framed to encourage the rapid development of the mineral resources of the country, not only by giving to the prospector and the miner an opportunity to acquire a title to the valuable property in the search for and discovery of which he had expended his strength and his money, but also that such development should not be retarded by allowing a fortunate few to monopolize large tracts of

such lands, with the expenditure of slight effort. The valuable mineral deposits seldom exist in large areas, and the limit given, to-wit: 1,500 feet in length and 600 feet in width, is large enough for one claim, all will admit. Indeed, the miner in the exercise of the *quasi* legislative power conferred upon him, usually makes it much less.

It is claimed by defendants' counsel, and I endorse it as having much reason, that the sinking of a shaft disclosing the existence of the same vein at another place in the same mining claim, as in the case at bar, is not a discovery of a vein within the meaning and intent of the Act of Congress, but a mere development of a vein already discovered.

But it is urged by plaintiff's counsel that conceding that no discovery of a vein was made in the "Ophir" claim at the time of its attempted location in June, 1876, still that such discovery was made therein prior to any discovery of such a vein within the defendants' mining claim, the "Golden Terry Extension;" and counsel say in substance, that while the want of a discovery would give plaintiff's grantors no rights until such discovery was made, the very moment it was made the inception of the title would take place, and what they had done before in the way of staking, recording, improving, etc., still existing, would inure to their benefit as though done at and subsequent to the time of the discovery, and the validity of the location would date from the time of such discovery.

I think the proposition thus presented is sound law. The order of the acts to be performed is non-essential, providing no intervening rights of others have accrued.

I, then, have to determine when the discovery of the vein did occur within these respective locations. It is claimed by the defendants that the discovery of the vein in the "Golden Terry Extension" was made in what was known as the discovery shaft therein on the 20th day of August, 1876. It is conceded and admits of no doubt that no discovery of a vein was made in the "Ophir," outside of the "Terra" limits, until long after the 20th of August, 1876. Indeed there was no such discovery therein until the developments and under-ground workings in the "Gol-

den Terra" were carried into the "Ophir" sometime in 1878. For while it is claimed that in the upper workings of the "Terra" westerly of the "Ophir" discovery shaft, carried beyond the side lines of the "Terra," a vein was disclosed in the "Ophir," still I am of the opinion from the evidence, and so find, that the top or apex of that vein was within the side lines of the "Terra," and that, therefore, no discovery could be predicated on such "Golden Terra" workings.

It is denied by plaintiff that any discovery of a vein within the meaning of the Act of Congress, was made in the discovery shaft of the "Golden Terry Extension," and it is claimed by them that such discovery was not made until the tunnel, which intersects the bottom of the discovery shaft, had reached a point on its course into the mountains, some distance west of the shaft, and sometime later in 1877 or 1878.

This involves the inquiry:   What constitutes the discovery of a vein of a mineral-bearing rock in place, within the meaning of the Act of Congress, making it a condition precedent to a valid location?

Much and very interesting and valuable testimony has been adduced upon the subject relating to this particular case.   Many experts have been produced and have testified to the result of their careful examinations.

Gentlemen of recognized ability and candor, scientifically edu cated in this special line and practical miners, have given us the benefit of their learning and experience.

Specimens of the material found in the discovery shaft of the "Golden Terry Extension" have been produced in court for the inspection of the court and counsel.   All of the witnesses, I believe, without exception, have testified to the presence of some gold in the rock, taken from the discovery shaft.   Some testify to having, by their experiments, found several dollars in gold to the ton of rock; some to only a few cents or only a trace of gold.   The line of distinction seems to be this:   The plaintiff by its witnesses endeavors to show that the shaft was wholly in what they term the country rock, that is in slate, and that what gold was found was in comparatively small quantities—in small seams or stringers of

quartz, irregularly interspersed through the slate, and that the vein was first disclosed some distance west or beyond the shaft from the mouth of the tunnel; and I believe most of the plaintiff's witnesses pronounced the vein as commencing where the *pay* ore commenced; that is in what they regarded as *pay* ore from the present standpoint of the expense of mining and milling, while the defendants' witnesses as confidently testified that the vein commenced east of the shaft, intersected it in its upward incline running through the shaft to nearly the cap rock; that the vein did not commence at what was now pay ore, but where the lines of impregnation with gold commenced, and where there was a marked distinction in the character and strata of the rock.

I am inclined to adopt, and do adopt, the rule of the practical miner and prospector, that the vein is discovered when there is disclosed a well defined body of rock in place carrying gold, which body subsequently proves to be continuous. In this district, as is well known, and as was shown upon the trial, it frequently occurs that the only line of demarkation between the surrounding country, and the vein or body of ore, is where the rock begins to bear gold. The slate or country rock itself frequently carries gold, and is successfully and practically and profitably worked as ore. In the bodies of ore are frequently found masses of material differing from the great part of the ore proper, and which is more or less mineralized, some of which is milled and some thrown away as waste.

Frequently, and notably so in this vein, a part of which is in controversy, there are no regular well defined and easily distinguished wall rocks, as are found in some other mineral districts. A selvage along the wall rock is of rare occurrence, if any exists at all anywhere.

I cannot adopt the rule that the vein must be deemed that part which contains *pay* ore. The term *pay ore* is a relative term. What does not now pay the expense of mining and milling; what is waste to-day, may, with cheapened transportation, material and subsistence of operatives, to-morrow be pay ore.

I have found, and do determine, that the discovery of the vein in the defendants' mining claim, known as the "Golden Terry

Extension," was made by the locators on the 20th day of August, 1876.

I have further found that the locators otherwise fully complied with the laws of Congress, and the local laws, rules and regulations to entitle them to the exclusive possession of the said "Golden Terry Extension" mining claim, and that by regular transfer the title and possession have come to these defendants.

Having arrived at the foregoing conclusions, I might, with eminent propriety, discontinue further consideration of the case if I was reviewing it upon questions of law, as in an appellate tribunal, as I regard such conclusions decisive of the action; but I am trying in this court the facts, as well as determining the law applicable thereto, and parties have a right, so far as the decision technically such, is concerned: that is, the findings of fact and conclusions of law, to require the court to pass upon all the questions involved which are embraced within the issues. Therefore, I deem it proper to give my reasons for the conclusions I have arrived at upon the other principal questions in the case.

The next important question in the order I have adopted, arises upon the alleged estoppel, plead by defendants, the facts concerning which I have found, and may be briefly stated as follows:

Subsequent to the 7th of June, 1876, the date of the attempted location of the "Ophir," and some time in July, 1876, Wm. Story, the grantor of the defendants, except Mahler, sought to prospect upon ground lying west of the "Golden Terra." The owners of the "Golden Terra" and "Ophir," thereupon, requested him to desist from such prospecting, claiming the ground as their own, which he did. A few days afterwards Storey and the defendant Mahler were at the "Golden Terra" location, and upon inquiry of the then owners of the "Golden Terra" and "Ophir," if they knew of any ground in the vicinity which was vacant, and upon which they would be likely to find a vein of gold-bearing ore, and upon which they could make a location, one of such owners, with the knowledge and consent of the others, went with Storey and Mahler to the south end of the Golden Terra," and pointed out this very ground in dispute, and told them there was vacant ground where they would be likely to

find ore, which ground they could locate and appropriate to their own use, and at that time this one of the owners, and subsequently the other of them expressed a desire that they should find a good vein of ore at that place, as it would prove the extension of their "Golden Terra" vein, and show it to be continuous, and would thereby enhance the value of their property, the "Golden Terra" vein.

Immediately after having the ground there pointed out to them by the then owners of the "Terra" and "Ophir," and being induced thereby, and being wholly unacquainted with the fact of any existing claim such claimants might have to the ground then pointed out, and being thrown off their guard by their conduct, so far as a search of the records and examination of the ground for stakes or other evidence of appropriation were concerned, the said Story and Mahler proceeded to work thereon, expended a considerable amount of labor and money in prospecting and in development of the ground, and subsequently made a discovery of the vein of ore which is now in controversy, and thereafter they and their grantees, these defendants, prosecuted the work of development by running a tunnel over a hundred feet into the mountain, such expenditure amounting to more than one thousand dollars, before any intimation of a controversy over the ground came to the knowledge of said Story and Mahler or their grantees.

During all this time while the owners of the "Golden Terry Extension" were expending their money and labor thereon, the then owners of the "Golden Terra" and "Ophir" were frequently upon the ground, saw the work as it progressed, knew they claimed the ground and had staked it as their own ; indeed, one of such owners of the "Golden Terra" and "Ophir" assisted in the staking, and all expressed gratification that the "Golden Terry Extension" owners had met with success in finding such a good vein of ore, both because they were pleased to see the "Golden Terry Extension" owners prosper and because it would enhance the value of their "Golden Terra" mine, and at no time by word or deed did they express or manifest any dissent from, or objection to, the "Golden Terry Extension" owners their proceeding, nor to their claim of ownership to the property. I am satisfied from the proofs that the first claim made to such disputed ground after

Storey and Mahler took possession, came not from the locators of the "Ophir," but from their grantees long after the original locators had ceased to have any interest therein.

It is manifest further from the fact of their so readily ceasing to prospect west of the "Golden Terra," when requested so to do by its owners, and from other facts appearing, that these locators of the "Golden Terry Extension" would not have attempted work upon such extension, would not have made any claim thereto, and would not have interfered in any way with any rights, or supposed rights, of locators of the "Ophir," had they not been thus induced by the representations so made to them that the ground was vacant and they were at liberty to claim it for themselves.

If these former claimants of the "Ophir" now through their grantees can be permitted to assert a title, which they thus disclaimed, it would be a reproach to the administration of justice. It must be presumed, and it does satisfactorily appear they knew the true state of their own title. Every element essential to constitute an equitable estoppel sufficient to operate as a transfer of the title from them if they possessed it, is here present. I do not, however, regard this as the ordinary application of the doctrine of estoppel. That principle is frequently invoked to prevent the recovery of real property when its enforcement operates to transfer the title legally in one person to the other. In cases of that character its operation is to disregard the Statute of frauds and make the transfer of realty possible without the formalities required by law. In this case the locators of the "Ophir" if they had all that is now claimed for them, had only the possessory right which they could abandon at any time. They could at their own option become divested of their property therein by simply non-user and failure to comply with the conditions under which they held it. No disclaimer by them of the title would operate to transfer any rights of property from them to any one else. The principle of equity and good conscience thus involved would in no way operate to give these defendants the benefit of any title acquired by the locators of the "Ophir." No non-user and non-compliance with the conditions of their possessory rights would thus operate; all the effect possible would be simply to

relegate the property back to its former condition before they were connected with it. To remand it back to the great body of the unclaimed mineral lands of the United States, and make it possible for these defendants to obtain the title from the United States. The defendants do not claim under the plainiff's grantors nor through them, nor are they in any way, directly or remotely connected with any title or possessory rights which they held.

Therefore, I regard the case as more in the nature of an abandonment by the plaintiff's grantors, and this equitable principle if applied, operates to prevent them and their successors in interest from now claiming a possession which they induced the defendants to believe they had abandoned.

However, I do not need to apply in this case a less stringent rule than is usually applied when the principles of an equitable estoppel are invoked.

The facts are sufficient, and the plaintiff if it could otherwise establish its title, cannot now be permitted to assert any claim or right of possession to the ground in dispute, derived solely from the original locators of the "Ophir."

I have thus far considered this case without reference to the fact that until the ratification of the treaty with the Sioux Indians, February 28th, 1877, the district of country in which the property, the subject of this litigation is situated was a part of what is known as the great Sioux Indian Reservation.

The effect of the existence of that reservation was a subject of discussion upon the trial, although I do not understand that either party cared particularly to press it upon the attention of the Court, for it was manifest that if it was decided to have any bearing upon the case, both parties would be alike affected by it; in any event that the plaintiff could reap no benefit therefrom. I do not desire to determine a question of so much moment to many of those enterprising and hardy pioneers, who came to this then uninhabited district, in an early day, pushing the Indian from a land useless to him, but rich in everything that is the foundation of the white man's wealth, and who sought to acquire by their honest labors, valuable properties, unless I am necessarily compelled to do so ; and the more especially as I hope the present

session of the Congress of the United States will by its enactment settle all doubt upon the subject. I do not deem it nessessary in the determination of this case to pass upon that question. I am not unmindful of the fact that if it shall finally be held that the existence of that reservation had the effect to exclude by law persons from the exploration, occupation and purchase of the mineral lands within its limits, and that no white man, save such as is specified in the treaty, could lawfully go there for any purpose, that then the plea of estoppel would be useless, and of no avail to the defendant. All would have been alike, trespassers, violators of the law, and no rights could have been acquired, and no title had its inception until the taking effect of such treaty ceding the reservation.

I have found as facts in this case, that at the time of the taking effect of such treaty, on the 28th day of February, 1877, the defendants, and those from whom they claim, were in the actual, peaceable, exclusive possession of the disputed property, a discovery of a vein was therein, the proper compliance with the laws, rules and regulations existed, or were in apt time thereafter made by them, including the due recording with the register of deeds of the county after its organization, therefore I hold it to be immaterial, so far as the plaintiff's right of recovery is concerned, whether the original locations were affected by the existence of such reservation or not. In no view of the case is the plaintiff entitled to recover.

Other questions of minor importance are in the case, which I do not deem it necessary to consider, further than appears in the findings, as in the views I have expressed they do not affect the result.

For the purposes of an appeal I find the value of the property in controversy to exceed one hundred thousand dollars, it being so stipulated by the parties.

Let judgment be entered for the defendants.

OPINION OF THE DISTRICT COURT UPON MOTION FOR NEW TRIAL.— The plaintiff moves for a new trial in this case and alleges as grounds therefor.

I. Irregularity in the proceedings of the court, in that the Court rendered its decision after the alleged destruction, by fire, of the pleadings, the depositions, exhibits and oral evidence taken at the trial.

II. Accident which ordinary prudence could not have guarded against, to-wit: The destruction of the pleadings, depositions, exhibits and oral evidence, occurring by the fire in Deadwood on the 26th day of September last, after the cause had been tried and submitted to the Court for decision, whereby it is claimed plaintiff will be deprived of a review of the findings of fact in this court and the appellate court.

III. Insufficiency of the evidence to justify the findings of certain facts which are specified in the motion.

IV. Errors occurring on the trial in the admission of certain testimony relating to the validity of the " Golden Terra " location, upon which was based the conclusion of the Court; and also in the admission of evidence relating to certain acts and declarations of plaintiff's grantors relative to the property in dispute, which acts and declarations took place prior to the ratification of the Indian treaty, February 28th, 1877.

V. Error in not finding certain facts in the motion specified, which facts were included in the findings proposed and submitted by plaintiff's counsel.

VI. Error in each of the conclusions of law.

The motion is based upon the minutes of the Court, and upon affidavits alleging the destruction of the pleadings, documentary and oral evidence at the fire above referred to.

As to the third, fourth, fifth and sixth reasons, briefly stated above, and which are more elaborately set forth in the motion, I have only to say that the conclusions I arrived at were had after careful consideration of all the evidence and of the law applicable thereto, as I understand it, the principal reasons for which I have already given at some length, and nothing has been urged upon this argument, nor do I know of any cause to change my views. I am entirely satisfied with the conclusions, both of fact and law, contained in the decision.

Indeed the argument upon this motion has been confined to the causes stated in the first and second grounds above given. Those causes I propose briefly to review:

1st. As to the alleged irregularity in the proceedings of the court in rendering a decision after the occurrence of the fire at which the stenographer's notes, the transcripts therefrom furnished the counsel for the respective parties, and the original pleadings were destroyed, the facts are these: I had a copy of the pleadings furnished by plaintiff for the court in pursuance with the requirements of the Statutes. A large part of the testimony compiled from the stenographer's transcript relating to all those subjects I deemed as material to the just determination of the case, my own memoranda, and the findings prepared and submitted by each party. These were preserved, and as stated in' defendant's affidavit opposing this motion, the copies of pleadings have since been substituted for and made originals, and the testimony and findings together with the plats and exhibits thereto attached have been placed and are now with the clerk of this court. The record proper, to-wit: the pleadings, minutes of the trial and decision being now complete.

Again: The fire occurred on the morning of the 26th of September. My decision was not filed until December 6th. In the meantime, save about three weeks, I was absent attending the Supreme Court at Yankton. The court was constantly daily open for the transaction of business, notwithstanding which no motion was made relative to the subject, and no suggestion ever reached me of the propriety of postponing the decision until the evidence could be retaken or substituted. Certainly the amplest opportunity was afforded, and if such a course had been deemed advisable by plaintiff's counsel, they should have moved the court to that effect, or in some way called the court's attention to the necessity or propriety of reproducing the evidence in all its details and minuteness before the decision was filed, and if they failed to do so they cannot now be heard to complain. Under the practice prescribed by law in this Territory, the evidence adduced in an equity case, as in an action at law, does not come upon the record, and forms no part of it unless brought there by a bill of excep-

tions or statement of the case signed and settled in the mode prescribed by law. Having at hand all the facilities for a proper, and as I believed then and still believe, just determination of this case, it was no part of the court's duty to cause whatever of the evidence adduced upon the trial which has been destroyed to be reproduced or retaken. Therefore, I conclude the first point, to-wit: the irregularity in the proceedings of the court complained of to be not well taken.

The remaining and principal ground urged for a new trial in this case presents a more difficult question.

It is one of importance in this court because it is likely to affect other cases besides the one under consideration. I recognize the propriety, if not the necessity, of affording to parties relief against an accident of this character, if such relief can be given without violation of the plain letter of the law, or without injury to the opposite party, both parties being equally blameless, but the question is, what in this case is the proper remedy to afford the requisite relief? Is it to grant a new trial and thereby compel the defendants to incur the additional expense incident thereto, as well as the risk of losing by death or otherwise, valuable and material testimony? Or is it by affording the plaintiff the amplest opportunity to bring upon the record the testimony already adduced by incorporating it into a case or bill of exceptions, and if necessary, in case of difference between the parties, and the court is otherwise unable to determine such evidence, by allowing witnesses to be called or recalled, and thus the destroyed testimony to be reproduced? I must take into consideration the evident fact that neither party is at fault. If misfortune has overtaken the plaintiff by this accident, I cannot transfer the misfortune to the defendants, and especially if it can be repaired without doing so.

It has come to my knowledge by proceedings in this action, that one of the defendant's most important witnesses has deceased since the trial. A large mass of the oral, and at least a part of the documentary, evidence has been preserved. As much of the destroyed oral and documentary evidence as could be had in a new trial, can be reproduced and put into the bill of exceptions or case. It may be difficult and involve much labor, but it is not

impossible. I see no difficulty in counsel bringing before them their witnesses in instances where the testimony or its substantial parts have escaped them, and learn what in substance such witnesses did testify to. I believe copies of all the *necessary* documentary evidence are already with the clerk, among the findings and evidence returned to him. The power of the court is sufficient to afford the needed time, and if there is any doubt upon that subject, defendant's counsel have already in open court offered to stipulate, which offer the court will enforce if necessary. Therefore, I have concluded that the just and proper remedy—just to the defendants as well as the plaintiff—is not by granting a new trial, but by allowing plaintiff time and affording facilities for bringing all the evidence upon the record it desires to incorporate into the bill or case, and I have drawn an order to that effect.

In support of the motion upon the ground of accident, plaintiff's counsel have quoted *Hughes v. Washington,* 65 Ills., 245; *Borascule v. Boswart,* 98 Mass., 34; *Chittendon v. Schewerhon,* 35 Mich., 370; and a case in 5 Mich., 511.

The case of *Hughes v. Washington,* 65 Ills., 245, was a chancery case. The Judge in that case, after the destruction by the Chicago fire, of all the evidence, passed the decree without giving any opportunity for its reproduction or retaking, and the Supreme Court held that inasmuch as under their practice, analagous to the chancery practice proper, the evidence as taken and reduced to writing, became a part of the record, and was the basis of the decree and necessary for its support, it was error to pass the decree until the opportunity was afforded to reproduce it, and vacated the decree to the end that the evidence might be retaken, but a rehearing or new trial was not in that case granted. Our practice in equity cases, as I have stated, differs from the practice recited in that case, in that the evidence does not go upon the record unless it is brought there by statement of case or bill of exceptions, the same as in actions at law, and is not a basis for or necessary to the support of the judgment, but the decision, to-wit: the findings of fact and conclusions of law are all that are necessary in an action tried by the Court to support the judgment, together with, of course, the pleadings.

In the Massachusetts and Michigan cases a new trial seemed to be the only remedy. The bills of exception had been prepared, had been agreed upon, and by the neglect of the Judge in the one case, and his going out of office in the other, and the expiration of the term at which the case was tried, the losing party had absolutely lost the benefit of his exceptions, and the only relief that could be afforded was the granting of a new trial. The Appellate Court holding that under those circumstances it was not error in the lower court, in the exercise of a proper discretion, to grant a new trial. Moreover it appeared affirmatively in those cases, as I understand them, that if the losing party could have had the benefit of his exceptions they would have afforded of themselves ground for new trial. In this case it does not appear and cannot appear, until a bill of exceptions is made, whether plaintiff has any ground of complaint regarding the decision or ruling of the Court. Of course, *prima facie*, the right is with the defendants.

Again : in this case no right to have settled a bill of exceptions or case has been lost by delay. I cannot regard these cases as sufficient authority for me to take the responsibility of adopting so radical a rule of practice as is here demanded, and in the absence of precedent in this Territory or elsewhere for affording the remedy of a new trial, simply because it may be difficult and to counsel seemingly impracticable to make up as full and complete a bill of exceptions as they may in their commendable zeal for their client's interest desire. I recognize fully the rights of parties to have a review in the Appellate Courts of the determination and rulings of this court, and as I have indicated, I will, so far as lies in my power, in the exercise of a proper discretion, afford them every facility to that end ; but I cannot disregard the legal and just rights of the other parties to the action. The motions for a new trial must be overruled.

*Corson & Thomas*, for appellant.

This action was brought by the Golden Terra Mining Company, appellant, (a corporation organized under the laws of the State of California, transacting business and holding property in this Ter-

ritory, in compliance with the laws thereof,) against the respondents, to recover about two hundred feet by one hundred and fifty feet, of what is known as the Golden Terry Extension mining claim, the plaintiff claiming the ground in controversy by virtue of its ownership of what is known as the "Ophir" mining claim, which includes a part of the so-called "Terry Extension."

The suit is in the nature of an action to quiet the title, and for an injunction. The answer of the defendants, besides being a specific denial of the allegations of the complaint, sets up an equitable estoppel and a prayer for affirmative relief.

The issues were tried by the Court without a jury. The trial was had in July, 1879, at the February additional term of said court in and for Lawrence county, and lasted nearly four weeks, testimony taken on the trial covering more than five thousand pages, besides a large number of depositions of parties not within the jurisdiction of the court, were read upon the trial.

At the conclusion of the testimony and after argument of the counsel, the whole matter was taken under advisement by the Court, the respective parties at the same time submitting to it their proposed findings of fact.

In the meantime, and on the 26th day of September, 1879, the fire, which burned the principal part of Deadwood, occurred, in which all the papers, transcripts of oral evidence, depositions and exhibits in the case, were burned, except copies of the pleadings; the proposed findings of fact, and a partial abstract of the testimony upon certain points prepared by the defendants' counsel to sustain their theory, including therein only such detached parts of the evidence as was given on the part of the defendants and such portion of evidence from plaintiff's witnesses, as they thought might tend to aid them; these were in the hands of the Judge and were preserved. The abstract prepared by the plaintiff's attorneys for the same purpose and substantially in the same manner, was destroyed.

There were many seriously contested questions of fact as well as of law. The "Ophir" and the "Golden Terra" in said diagram, belong to the plaintiff. That portion of the so-called "Golden Terry Extension," included within the "Ophir" lines is the property in controversy herein.

The " Gopher " claim appearing on diagram, is a fractional claim made by certain parties between the " Terry Extension " and " Golden Terra," but is not involved in this action. These diagrams sufficiently present the outline of the respective claims and points that can be considered on this appeal.

The questions of fact involved on the trial, and the leading facts relating to the locations, will be more at length referred to and commented on hereafter, in the argument on the motion for a new trial. The appeal is from the judgment and from the order denying and overruling plaintiff's motion for a new trial. This motion should have been granted by the court below, for the reasons stated, to-wit:

I.   Because the Court rendered its decision in said action after the destruction by fire, without the fault of plaintiff, of the records, all the depositions, exhibits and all the oral evidence taken in said cause.

II.   "Accident which ordinary prudence could not have guarded against :"

"1st.   That, after the conclusion of the evidence, argument of counsel, and the submission of said cause to the court, and before said decision was rendered, the records, all the depositions, exhibits in said action, and all the oral evidence taken on the trial of said action, were destroyed by fire, without the fault of plaintiff, to-wit: by fire that destroyed the principal part of Deadwood, on Septem- 26, 1879.

"2d.   That, by the destruction of said records and evidence, the plaintiff is deprived of a review of the findings of fact and conclusions of law by this court, and by the Appellate Courts, to the great and irreparable injury of said plaintiff." (Dakota Code of Civil Procedure, p. 560, § 286, subdivisions 1 and 3.)

Upon the question of fact here involved, reference is made to the opinion of the Court rendered on said motion. There is practically no dispute between the plaintiff's attorneys as to what was preserved and what was destroyed by the fire.

The court below passed upon this motion, upon the point we are now discussing, and denied the motion, on the ground that he had

not the power to grant it on account of such destruction of the evidence.

The suggestion of the Court, that he "saw no difficulty in counsel bringing before them their witnesses in instances where the testimony or its substantial parts had escaped them, and learn what, in substance such witnesses did testify to," is novel under the present system of practice, and entirely impracticable, especially in the district where the cause was tried.

How, by such a process, are we to reach witnesses beyond the jurisdiction of the court, who were sworn on the part of the defendants as well as on the part of the plaintiff?

Supposing a witness, hostile to the plaintiff, is called by the plaintiff to restate his testimony, and a dispute arises as to the correctness of it, who is to settle the dispute and determine what his testimony was? Counsel might not agree, and the Court not be supposed to recollect.

The question is, therefore, presented in this court for the first time, as it was in the court below, so far as we are aware, whether a party is to be deprived of a review of the findings of fact in an equity case by the Appellate Court, and his benefit of appeal lost, so far as the facts are concerned, by an " accident which ordinary prudence could not have guarded against."

The fact that the motion was denied upon this ground in the court below, ought not to be considered in this court, in the same light that the court would consider such a decision upon many of the other grounds named in the Statutes for new trials. In a case like this, presenting a new and important question, the court below might well hesitate to grant the motion as the court below did in this case, and throw the responsibility upon the Appellate Court. This court should, therefore, consider this question, without reference to the question of discretion in the court below, adopting the " rule of modern practice of liberally granting new trials in furtherance of justice," and reverse the decision of the court below.

It should be presumed, and it is a fair deduction from the record in this cause, that counsel who brought this suit for plaintiff, prepared it for trial, and conducted the trial upon that side to

its termination, had confidence in the theory of the plaintiff, upon the facts as set forth and embodied in the plaintiff's proposed findings, and that they would use every endeavor to reproduce, and have incorporated in the bill of exceptions, the evidential facts to support such theory.

Having found it impossible to reproduce the evidence, and believing the court below was wrong in accepting the theory of, and finding for, the defendants, and in denying the motion for a new trial, we have appealed to this court for relief in the premises.

In passing upon the question of fact, as to the practicability or possibility of reproducing the evidence so as to enable this court to fully and fairly pass upon all the material propositions, and give to plaintiff the benefit of appeal guaranteed by law; the importance of the case; the length of time consumed on the trial, (nearly four weeks); the volume of testimony introduced, covering over five thousand pages, besides depositions; the fact that counsel took no memoranda, but relied on the stenographer's notes and the transcripts therefrom, as is now the universal practice in important cases, without charging their minds with the details of the evidence; the length of time that elapsed between the submission and the decision, (from July to December 6th, 1879); the fact that in the meantime counsel engaged in other important matters, not expecting to be called upon to reproduce the evidence from recollection, would, in the very nature of things, find it extremely difficult, and in the case of any ordinary memory, impossible, to recall all the leading facts, much less the innumerable minor but important and essential facts in a case like this.

This being an equity case this court would review all the evidence if incorporated in the bill of exceptions and pass upon the weight of the testimony and find accordingly.

This rule obtains under the Code the same as under the old chancery practice. In an equity case the verdict of finding of fact has substantially the same effect as a verdict on a feigned issue in chancery. This court is not bound by the findings of the court below as it would be in an action at law, though there might be conflict in the testimony. Hence the importance of a full and complete report of all the evidential facts adduced on the trial in the

court below in order to give the appellant the benefit of its appeal. (*Watt v. Starke*, 11 Otto, 247; *Johnson v. Harmon*, 4 Otto, 371; *Clark v. Brooks*, 2 Abbott, N. S. N. Y., 385; 22 N. Y., 420; *Forest v. Forest*, 25 N. Y., 501, 512; 34 N. Y., 190, 195; Jackman Will Case, 26 Wis., 104; *Withe v. Rowe*, 45 Me., 571; *Shailer v. Bumstead*, 99 Mass., 112, 131; Chafin Will Case, 32 Wis., 557, 569; *Brook et al v. Chappell*, 34 Wis., 405, 411, 412, 413; *Lombard v. Cowhan*, 34 Wis., 486, 490, 492; Pritchards Will, 37 Wis., 70; *Law v. Grant*, 37 Wis., 548, 559; *Du Pont v. Davis*, 35 Wis., 631, 642, 643.)

This power and duty of the Appellate Court to review the evidence and pass upon the weight of the testimony in an equity case is a contitutional provision which cannot be abridged or taken away by the Legislature. (The City of Panama, 11 Otto, 453, 455; *Smith et al v. Odell*, 1 Pinney, Wis., 449; *Callanan v. Judd*, 23 Wis., 343; *Freeman v. McCollum*, 20 Wis., 360, margin page.)

For the purpose of calling the attention of the court to the importance of a new trial we will briefly refer to some of the leading questions of fact presented to the court below, and which the court would consider and determine if the evidence could be produced and brought before it.

The plaintiff contended on the trial and adduced a large amount of evidence to prove, and in our opinion did prove and establish:

I. That in June, or the fore part of July, 1876, the locators of the "Ophir" mining claim ran a cut about twelve feet long, and at one end thereof sunk a shaft, exposing therein a well defined valuable vein of gold-bearing quartz rock, in place; that said cut was run and said shaft was sunk on the west side line of the "Golden Terra" mining claim, about 150 feet southeasterly of Bobtail gulch; a portion of said shaft and the vein of gold-bearing quartz therein exposed, being westerly of said "Golden Terra's" westerly side line; that said vein exposed in said shaft was within the "Ophir" lines, having its apex therein, and westerly of the westerly "Terra" line; that the owners of the "Ophir" mining claim also ran a tunnel, which was commenced on the south side of Bobtail gulch, and extended in a southwesterly direction toward the "Ophir" ledge, and within the "Ophir" lines, the work upon said tunnel being prosecuted continuously until it cut the "Ophir"

ledge, and passed beyond the west side line of the "Golden Terra" mining claim, in valuable gold-bearing quartz rock in place in said "Ophir" vein to the west of said "Golden Terra" line; that said tunnel was extended beyond the west side line of the "Golden Terra," in ore as aforesaid, in September, A. D., 1877, and prior to October, 1877; that on the 28th day of February and 1st day of March, 1877, the grantors of plaintiff adopted and reappropriated said location, as originally defined, it being then and there so marked on the ground that its boundaries could be readily traced, and having not only the original discovery shaft, exposing the vein therein, but also said shaft on the westerly side line and said tunnel exposing therein and westerly of the "Terra" line aforesaid, a well defined vein of quartz rock, in place-bearing gold, and within the exterior lines of the said "Ophir" location.

II.   That no discovery was made on or in the pretended "Golden Terry Extension" mining claim until January 10, 1878, and that consequently no right could be acquired by virtue of that claim until such discovery was made.

III.   That no work was done within the lines of the "Golden Terry Extension" mining claim from the 18th day of February, 1877, until after the 18th day of August, 1877; but that on the 28th day of February, 1877, and thereafter until August, 1877, all the work that was done relating to that claim, was upon the tunnel known as the "Terry Extension" tunnel, outside of the boundary lines of the "Extension" claim; that consequently there was no legal reappropriation or adoption of the "Terry Extension" claim, on the 28th day of February and 1st day of March, 1877, even if there had been a discovery within its boundaries, because work upon such tunnel, outside of the boundary lines, would not be sufficient, as an act of adoption or reappropriation of the claim in question, although it would be sufficient, as the courts have properly held, to prevent a forfeiture.

It was further claimed by the plaintiff on the trial that said "Extension" tunnel was continued from time to time until it reached the ore body (designated in this case as the "Terry Extension" vein,) about January 10, 1878, which was the first discovery made in said claim; that prior to that time, to-wit: on the

28th day of February, or 1st day of March, 1877, (accordingly as the court may hold, the premises in question became free and open to exploration and purchase,) the right of plaintiff's grantors in and to the "Ophir" claim, including the ground in controversy, had become vested.

IV.   That the grantors of plaintiff at all times prior to the purchase by the plaintiff claimed the "Ophir" as originally staked.

V.   The theories of the plaintiff and defendants were radically different on the questions of fact relating to the alleged defense of an equitable estoppel in defendants' answer.   While we claim that this defense cannot be maintained in this action for the reason that all the facts relating to it occurred in 1876, prior to the abrogation of the Indian treaty, yet it is evident that the court below came to the conclusion that the equities were against the plaintiff upon this alleged defense, and that such conclusion may have induced the court to more readily adopt the theory of the defendants in relation to the other questions of fact.

Out of these main propositions of fact grew a number of minor propositions upon which evidence was adduced tending to illustrate, explain and establish the foregoing, which we need not now specially refer to for the purposes indicated.   Enough has been suggested to indicate to this court the great importance to plaintiff of a new trial.

If the court below had found the above and foregoing propositions of fact in favor of plaintiff, then it must have found the conclusions of law in favor of plaintiff.   It would have been bound to have held that on the 28th day of February, or 1st day of March, 1877, the "Ophir" mining claim became and was a valid location, although the court might not have found with us on the theory that the "Ophir" claim could be predicated upon a discovery within the lines of the "Terra" claim: That is, notwithstanding the court might have held that no new location could be made or maintained by the same parties, based upon a discovery within the exterior lines of a prior location owned by them; yet, inasmuch as the plaintiff's grantors had a discovery both in the shaft on the west line of the "Golden Terra" and in the tunnel as aforesaid, westerly of said "Terra" line, within the lines of the

" Ophir," and had otherwise complied with the mining law, as found by the court, on and after February 28th, 1877, the court would have held that they were the first appropriators of all the veins, lodes, ledges and surface within the boundaries of the " Ophir," including those in controversy in this action, if he also held that no discovery was made upon the " Golden Terra Extension " claim until January 10th, 1878, as claimed by plaintiff.

The court could not have held in that case as it did in the conclusions of law, 16, 17 and 18, that at the time of the alleged conveyances of the " Ophir " to plaintiff, the ground in controversy was in the actual possession of the defendants claiming the same adversely, and that the deeds to plaintiff for the same are therefore null and void. Plaintiff's grantors being in possession of part of the " Ophir " claim, would have been held to have been in the actual possession of the whole of the claim; the boundaries being marked as required by law. (*English v. Johnson*, 17 Cal., 107; *Rogers v. Cooneg*, 7 Nev., 214, 219.)

All these propositions were supported by a large amount of testimony. The witnesses were carefully examined, and in many cases thoroughly and extensively cross-examined; many depositions of witnesses, beyond the jurisdiction of the court, were read which could not be reproduced, nor the witnesses be examined before the court in the manner suggested in the order overruling the motion for new trial. They could not be brought before this court by subpœna. If their depositions were taken as to what they testified to before, there is probability that the opposing counsel and the court could have agreed as to the correctness of them. The mere suggestion of such an expedient shows its impracticability. A large amount of expert testimony was taken relating to the question of discovery, and also as to the position of the apex of the " Ophir " lode with respect to the lines both of the " Terra " and " Ophir." It is unreasonable to presume that counsel, however experienced, can reproduce this branch of the evidence so as to enable this court to pass intelligently upon those mooted questions.

The court below had and this court has ample power under the Statute to award plaintiff a new trial upon this assignment of error.

The destruction of the testimony, as aforesaid, was an " accident " within the meaning of the Statute, which ordinary prudence could not have guarded against. An " accident " is, as defined by Justice Storey, and sanctioned by Willard, in his work on Equity Jurisprudence, as follows: " By the term accident is understood, not merely inevitable casualty, but such unforeseen events, misfortunes, losses, acts or omissions as are not the result of any negligence or misconduct in the party, and which are productive of disadvantage." (Willard's Equity Jurisprudence, page 42, at the bottom, and 52 at the top; Story's Eq. Jur., § 78; Bouvier's Law Dictionary, Vol. 1, p. 52.)

This term has been incorporated into our Statutes with its legal signification and construction. The above definition is accepted and recognized in all courts of equity. No court or author has attempted to limit the instances in which a court of equity will grant relief on the ground of " accident." When a case is brought within the spirit of the above definition of the term, a court will always grant relief.

It is a beneficial and reserved power, by which the court is given the authority to grant relief in a proper case, and it ought not to be too strictly construed.

There is no law for accidents, as to when and how they may occur, in the ever varying circumstances and conditions of business transactions. An " accident," after the submission of a cause, or at any time prior to its final determination in the original or appellate court, may be as serious and productive of as much or more disadvantage or injury as one occurring prior to the submission or verdict. And the Legislature of this Territory, recognizing that fact, has wisely and beneficently placed in the hands of the courts, by the provision in question, the power to grant relief by a new trial, at any time, in furtherance of justice.

This provision of our Statute was adopted out of an abundance of caution, for the power was and is inherent in the courts to grant new trials on this ground without the aid of the Statute. Fortunately we are not left on this question to the process of reasoning upon principles or from analogy. It has been settled in the following cases: *Borrowscale v. Bosworth*, 98 Mass., 34 *Chittenden v.*

*Schermerhorn,* 35 Mich., 370 ; *Scribner v. Gray,* 5 Mich., 511, 514 ; *Platt v. Monroe,* 34 Barb., 291 ; *Hughes v. Washington,* 65 Ills., 245.

The Massachusetts statute is substantially like our own, (page 36 of opinion, 98 Mass.,) except our Code has collated the modern rules for granting new trials that obtain generally in the best courts including the rule for granting a new trial on the ground of "accident" which ordinary prudence could not have guarded against.

This power is substantially unlimited. We quote from the Massachusetts opinion above, page 36, as follows : " We know of no limit to the power of the court so to interpose (to prevent the injurious consequences proceeding from accident and misfortune) where the plain and manifest dictates of justice require it. (Referring to opinion by Chief Justice Shaw, in *Cutbar v. Rice,* 14 Pick., 494.) See page 37 Mass., opinion as to the right of a party aggrieved, to the judgment of the highest court ; also *Hughs v. Washington,* above pages 247 and 248.

We insisted on our motion in the court below and now assert, after the most diligent efforts on our part, that it is absolutely impossible to reproduce the evidence in this case so as to fully protect the rights of the plaintiff and give in this court the privilege of a review of the findings of fact as well as of the conclusions of law.

But we are not compelled to establish that a restoration of the evidence is impossible. If it is impracticable to restore it the plaintiff is entitled to a new trial. (Mass., case above page 38.)

" If justice seems to require it and the preservation of the exceptions have become impracticable or for any reason might not fully protect the rights in controversy, a new trial may be granted in the discretion of the Court."

A case appealing stronger to the discretion of the court than this, we apprehend, cannot be found. The case of *Hughs v. Washington* is in point.

In an equity case under the old practice, an order to restore the evidence is to all intents and purposes a rehearing of the case or the granting of a new trial under our practice. Because when the evidence is restored and the record complete, the chancellor

then reviews the entire case; he has the matter entirely under his control and finds the facts according to the evidence and record then existing, whether consistent with his former findings or not; (Page 249 of Ills. opinion;) while under our practice the findings of fact and conclusions of law when signed and filed, constitute the decision of the court and so remain unless a new trial is granted. The same principle is involved in each case. Our only remedy is a motion for a new trial; that is equivalent and takes the place of the retaking of the testimony or reproduction of the evidence by a re-examination of the witnesses under the old chancery practice. The result is substantially the same in both cases.

The court says on page 247 that "on an appeal from the decree each party has the right to rely upon the evidence heard in the court below to test the correctness of the conclusions at which the court has arrived; and in such a case the finding of the facts in the decree will be controlled by the evidence in the record where it appears that it has all been preserved. The appellate court will look into the record to see whether the evidence warrants the court in its action in finding the facts stated in the decree and if, from all the evidence that was heard, it appears the chancellor erred in the finding of the facts, the appellate court will disregard the findings and will be controlled by the evidence." The court also, on page 248, clearly points out the distinction between cases in equity and at law.

In the former, the party obtaining the decree must preserve the evidence; in the latter, the defeated party preserve it. The object is the same in both cases, to have the judgment or decree passed upon, and reviewed by the appellate court. If the evidence is destroyed, the party whose duty it is must reproduce it, if possible; if not, the court will grant him the remedy provided by law. In the Illinois case the remedy was adequate by a retaking of the testimony, for the reasons above stated. In the case at bar such remedy would not be adequate. A new trial is the only remedy.

The court below, in criticising the Mass. and Mich. cases, above referred to says: "Moreover, it appeared affirmatively in those cases, as I understand them, that if the losing party could have

had the benefit of his exceptions they would have afforded of themselves ground for a new trial.

"In this case it does not appear, and cannot appear, until a bill of exceptions is made, whether plaintiff has any ground of complaint regarding the decision or ruling of the court. Of course, *prima facie*, the right is with the defendants."

We do not so understand those decisions. In each of those cases the new trial was granted upon the ground of "accident" or misfortune resulting in the loss of the exceptions to the defeated party, and the question whether or not "they would have afforded, of themselves, ground for new trial," if they had been preserved and incorporated into the record, was not passed upon or considered. In each case the principle was recognized that the defeated party had a right to have his case reviewed, and passed upon by the appellate court, and that when he had lost that right by "accident" or misfortune, occurring without his fault, or had been so affected as to lose the full benefit of his appeal, a new trial was proper.

The effect of the learned judge's decision in this case is to deprive us of the benefit of our appeal, unless we produce the evidence, so that the court may see that we would have been entitled to relief, and then to deny us the only remedy by which we can produce such evidence. The plaintiff is thus left in a very unfortunate position.

Can it be possible that a system of practice can obtain in this Territory, that will compel a defeated party to abide the decision of the court of original jurisdiction, in a case like this, involving property of immense value, and questions of the highest importance?

Will not this court say, as did the Supreme Court of Illinois, in the case above referred to, on page 250: "The destruction of the evidence was occasioned by one of those public calamities for which the parties were in no wise responsible; and such being the case, neither of them should be prejudiced beyond what can not be repaired.".

The court below says: "It has come to my knowledge, by pro-

ceedings in this action, that one of the defendants' most important witnesses has deceased since the trial."

It is not suggested, and there is no evidence tending to show but that the same facts testified to by that witness may be proved by another or many other witnesses. Defendants' counsel, in their affidavit, opposing the motion, have not even suggested any detriment to the defendants on this ground. All new trials are the occasion of inconvenience to the defeated party on the motion, but the courts have never considered this a sufficient reason for refusing a new trial in a proper case. The rights of the plaintiff in this action cannot be repaired without a new trial.

New trials were granted in the following cases, on the ground of surprise. They are cited to show the liberal rule adopted by the courts: *Jackson v. Constantine*, 7 Wend., 62; *Coddington v. Hunt*, 6, Hill, 595 and 596; *Tilden v. Gardner*, 25 Wend, 662; *Parshall v. Klinck*, 43 Barb., 203; *Tyler v. Hoornbeck*, 48 Barb., 197; *Hoppock v. Stone*, 49 Barb., 524; *Continental Nat. Bank v. Adams*, 67 Barb., 318; *Platt v. Monroe*, 34 Barb., 291. Above cited.

That the court erred in admitting the evidence of Wm. S. Storey and other witnesses, offered by defendants, tending to prove possession and location of the "Golden Terry Extension" mining claim, in the months of July and August, 1876, or at any time prior to February 28th, 1877, against plaintiffs' objection. (*U. S. v. McCall*, 1 Dak, 320; *Uhlig v. Garrison*; *French v. Lancaster*. (Not reported.)

That the court erred in admitting the evidence of Thomas F. Durbin, and other witnesses, tending to prove that on the 28th day of February, A. D. 1877, and thereafter until the month of August, A. D. 1877, the work that was progressing on the "Ophir" lode and mining claim was also within the exterior boundaries of the "Golden Terra" mining claim, an alleged prior, valid, subsisting mining location, called the "Golden Terra" lode, which was then claimed by the same persons who also claimed the said "Ophir" against plaintiff's objection.

The defendants, not connecting themselves with the "Golden Terra" title, had no right to raise that question. The evidence offered and admitted was incompetent, irrelevant and immaterial.

The owners of the " Golden Terra " claim, whether the same parties or not, who located and owned the " Ophir " claim, not consenting or objecting to the proceedings of either party, the court must regard the better right, as between the parties litigant, to be vested in the first possessor and the grantees holding under him. (*Coryell v. Cain*, 16 Cal., 567 ; *Hubbard v. Barry*, 21 Cal., 321; Tyler on Ejectment, edition of 1876, page 72 ; *Moore v. Tice*, 22 Cal., 514–516.

That the court erred in admitting the evidence of Orloff Helwig and other witnesses offered by defendants, tending to prove that in the month of May, 1877, the grantors of plaintiff caused a survey to be made of the " Golden Terra " lode and of the " Ophir " mining claim and the exterior of said " Ophir " claim to be so marked as to leave out all of that portion of the claim that was also within the exterior boundary lines of the " Golden Terra " mining claim, against plaintiff's objection.

The rights of the plaintiff's grantors became vested in and to the " Ophir " mining claim on the 28th day of February, or 1st day of March, 1877. On those days the then owners, Bailey and Durbin, were at work in ore within the lines of that claim, having a discovery then and there and the location being then and there so marked and defined that its boundaries could be readily traced.

If the court adheres to the decision in *Uhlig v. Garrison* and *French v. Lancaster*, respecting mining locations upon an Indian reservation, then until the President of the United States issued his proclamation on that day, to-wit: February 28th, 1877, throwing this section of country open to exploration and purchase, there was no valid subsisting mining location touching the ground in controversy. The acts of Bailey and Durbin, as found by the court in said additional finding No. 26, were an adoption and relocation of the " Ophir " mining claim on the 28th day of February, 1877, as defined by its then existing boundaries. Any subsequent acts of survey referred to in defendant's offer would not tend to prove an abandonment of any portion of the ground in controversy in this action.

Assignment of errors upon conclusions of law :

I.    That the court erred in its first conclusion of law.  " That a valid subsisting quartz mining location segregates the ground included within its boundary lines from the public domain, and that thereafter, so long as the locator complies with the laws relating to lode claims he is entitled to the exclusive right of possession and enjoyment of all the surface within the lines of his location, and of all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extending downwards vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface location ; " (and no new right remains to be acquired inside of such surface lines by a new expose or development of the vein or lode near or remote from the discovery shaft, and no valid lode location can be made by the owner of a valid subsisting mining location within the limits of the latter, but in all cases a location must be made upon the unsegregated lands of the United States containing valuable mineral deposits and free and open to exploration, occupation and purchase.)

By the requisite acts of location the locator acquires all that can be acquired by location ; and nothing remains to be acquired by a repetition of the same acts, within the lines of the first location, so long as it shall remain intact. A location of a lode or claim cannot therefore be made in virtue of a discovery (so-called) within the limits of an existing lode claim.

The several assignments may be referred to and discussed together, as they all involve the question of a location predicated upon a discovery made within the limits of a prior mining claim.

Assuming, for the purposes of the argument, that the evidence warranted the findings of fact, and that the " Ophir " discovery shaft was sunk within the exterior boundary lines of the " Golden Terra," a prior subsisting valid mining claim, we maintain that the " Ophir " location was and is a valid mining claim. This proposition involves a construction of the Mining Law of 1872, Revised Statutes U. S. page — Sec. 2319.  Congress by this section intended to license the classes of persons therein named to explore and

purchase the valuable mineral deposits in lands belonging to the United States. It was a declaration of the policy of the United States as to its mineral lands. Prior to 1866 it had been the policy of the government to reserve from sale its mineral lands. That law gave the first license to the miner to go upon the public domain and explore for the precious metals.

But, it is well known that for a long time prior to 1866 mining had been carried on on the Pacific coast. That industry had in fact then become one of the most important in the country. The miners were, nevertheless, trespassers, and the government had the undoubted right to treat them as such.

By the law of 1866 the policy of the government was changed, and by section I of that act the mineral lands of the public domain, both surveyed and unsurveyed, were declared free and open to exploration and occupation, to citizens of the United States and those who had declared their intention to become such, under regulations prescribed by law, and subject to the rules of the miners in the several districts. (Weeks on Mineral Lands, pages 1 to 5, 380.)

The above section 2319 is substantially a re-enactment of section I of the law of 1866, made for the same purpose, and declares the same policy. That is the whole intent and purpose of the section.

Section 2320 of the law of 1872, provides:

1st. For maintaining and perpetuating the locations then existing.

2d. It defines the form and extent of locations to be made under that law.

3d. It provides that the location shall not be made " until the discovery of the vein or lode within the limits of the claim located."

The intent and purpose of Congress by this section was to declare that locations should be made in the form of a parallelogram not exceeding 1,500 feet in length and not exceeding 600 feet in width or less than 50 feet in width; and that the vein must be found, discovered or known by the locator, to exist within such

parallelogram before the location could be effectual as a mining claim under the law of Congress.    The words of the Statute are, in respect to the discovery, in said section 2320, as follows:  " But no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located."

There is no mysterious, technical meaning to the word ",discovery."  " The vein, a term well known and understood by the miners at the time of the passage of the law, must be found, exposed or demonstrated to exist within the limits of ,the located claim.

The plain object of the law is to dispose of the mineral lands of the United States for a money value, fixing one price for those containing veins and another for the placer claims.    The locator can, under the law and this section, take his full 1,500 feet or any less number that he may desire.    The minimum is not limited as to length.

All that Congress desired to specially provide for by the section in question were the form in question and the fact that a vein must be discovered or exposed within the parallelogram.    If the locator sees fit to extend a portion of his parallelogram over ground already appropriated, there is no reason in the law why he may not hold that portion of his location which was at the time free and open or a part of the public domain, provided always that the parallelogram has within it a discovered vein.    (Sickles Decisions, pp. 37, 41.)    That discovery may be made at any point within the boundaries of his claim.

Is there any reason growing out of the law of Congress why a location having its discovery on ground already appropriated, but within the proper boundaries, should be invalid?

The government as effectually disposes of as much of its vein or mineral deposit as it then owns as it would if the discovery should be made upon land not before appropriated.    Let us illustrate:  Supposing the locator desires to take and appropriate only 500 feet of a vein which he has discovered; it is conceded that he may do so, provided his location is in proper form, and he has exposed or discovered the vein within its limits.

Let us assume also that this 500 feet is the extension of a prior location. What difference does it make to the government whether the locator limits the length of his parallelogram to the 500 feet he designs actually to appropriate or extends it to a greater length over the prior located ground, so long as the prior locator does not complain, and the vein is discovered within the limits of his parallelogram.

If the discovery was made on that portion of the location which had not been before appropriated, and the parallelogram had extended over a portion of the prior claim, it would not be contended that such locator could not hold and have patented, if he complied with the law, all the land within the limits of his location, that was open to exploration at the time of making such location.

By what process of reasoning can it be claimed that such location would be absolutely invalid, if the discovery happened to be a few feet or more over, on the prior appropriated ground, so long as the vein was discovered within the lines of the claim located, and the prior locator or owner did not complain?

The vein is discovered as much in one case as in the other (for it is conceded that exposing the vein within one place in the location is all that is required to hold the claim for its entire length.) The form of the location is complied with, and the government disposes, at its regular price, of so much of the vein as is included within the location.

The reason given in the first conclusion of law by the court below does not meet the question, because upon the proposition we are now discussing, it is not claimed that the second locator could take any portion of the ground included in the prior location. It does not follow from the reasoning and statement in said first conclusion of law, "that no valid lode location can be made by the owner of a valid subsisting mining location within the limits of the latter, but in all cases a location must be made upon the unsegregated lands of the United States, containing valuable mineral deposits, and free and open to exploration, occupation and purchase." Such a conclusion does not follow from the premises stated. Nowhere in the law of Congress, or in any local law gov-

erning this district, is such a location prohibited. It would seem, if such had been the purpose and intention of Congress, it would have been clearly expressed in the act; but it is neither expressed nor necessarily implied, and there is no reason for such a conclusion growing out of the purpose or policy of the act. No policy is violated and no rights are infringed.

The court below, commenting upon this question, in its able opinion, after discussing the question as to the effect of so much of the "Ophir" as was included within the "Terra" lines, states the following: "Having arrived at that conclusion, I am of the opinion and so hold, that the spirit and intent of the Act of Congress is to require as a condition precedent to a location of a mining claim, that a discovery of a vein bearing valuable minerals shall first be made within the limits of such location, independent of any other subsisting and valid location.

It is the unappropriated public lands—the lands belonging to the United States, in which valuable mineral deposits are found, that are open to exploration, occupation and purchase. It is upon such lands mining claims can be located, and in such lands a vein must be first discovered." This is an assertion based upon no valid controlling reason to support it.

The suggestion of the Court in support of his above proposition is hardly sufficient. The Court says: "If one discovery can serve to authorize locations of claims indefinitely, a complete circle of claims may be predicated upon it, encircling it like the spokes of a wheel running from the hub, and thus a claim may be made to extend in fact nearly three thousand feet in diameter by simply adding a few names and stakes and notices and expending more money for labor and improvements. For if one discovery which is included within all the locations will suffice, labor and improvements at one place there included will also suffice." All the consequences that might follow from sustaining such a location mentioned and referred to in the above statement are possible and probable by a strict compliance with the mining law.

Weeks, page 26: This provision limiting the number of loca-

tions on a lode by the same person, in law of 1866—left out in law of 1872—compare the two "Acts," Weeks 380 to 403.

For instance: supposing that a party desires to take up 3,000 feet along a vein—there is no question but that the same person may make as many locations as he sees proper on the same vein or lode. Such locator desiring to appropriate 3,000 feet as aforesaid, sinks a single discovery shaft sufficient to expose the vein on the end line between the two locations, each running 1,500 feet from the discovery or shaft so sunk, such shaft being sunk upon the line would expose the vein in both locations, because part of the shaft would be upon one and part upon the other location. Would it be claimed for a moment that this was not a sufficient discovery upon which to predicate each of the locations; and if the locator otherwise complied with the law, would he not own both the locations? Would not the locator in such a case, in the language of the Court "by simply adding a few names, and stakes and notices, and expending more money for labor and improvements," secure by a single discovery his 3,000 feet along the vein, which is all that could be practically secured by the mode suggested in the foregoing remarks by the Court, as veins do not branch off and radiate like the spokes of a wheel. Practical miners do not locate claims in that way. This is one of the cases where theory and practice do not go hand in hand.

Again: if the locator finds the vein exposed on the surface, he need sink no shaft, run any tunnel or drift, but make his location— as many locations upon the same or different veins, as he thinks proper, predicated upon the discovery made upon the surface, requiring no work whatever. Each location may be 1,500 feet long, or less. If the discovery is actually made within the limits of the claim located, and he otherwise complies with the law, his rights are secure. This argument completely answers the following suggestion of the Court, that "if such is the true construction of the Act of Congress, to thus allow indefinitely locations based upon one or more discoveries in the same original location, then it opens the door to one of the very evils the law was intended to remedy, to-wit: such a monopoly of the public mineral lands by prospectors and speculators as would tend to prevent their speedy

and effective development. One person could, by a single shaft at one place, prevent the lands being explored or developed for an area of 3,000 feet in diameter, and the mineral therein contained, from being extracted and added to the wealth of the country."

We have already shown that a single locator may take up 3,000 feet along the lode by a strict adherence to the law of Congress. Such a location would be as much of a monopoly of the public mineral lands as the one suggested by the Court.

The reasons suggested and urged by the Court for the conclusion reached are untenable, because the conclusion is not warranted by the facts and the law. Congress prescribed general rules that were sufficient to protect the government in its disposition of the mineral lands, and secure the price named in the act. Beyond that, the whole matter is relegated to the local authorities.

It is entirely immaterial to the government of the United States, so far as appears from its defined policy, whether one or more purchase or make locations, so long as the price is obtained; otherwise there would have been some limitation in the act, as to the number of claims that could be located by a single person on the same vein.

This special provision of section 2320, that we have been discussing, to-wit: "That no location of a mining claim shall be made until the discovery of the vein or lode, within the limits of the claim located," was made to prevent the incumbering of the district mining records with useless locations before it was determined whether a vein or lode had been discovered or not. (U. S. Mining Laws and Regulations thereunder, from the General Land Office, April 1st, 1879, p. 14, subdivision 13; Weeks on Mineral Lands, p. 104.)

Prior to the law of 1872 there was no law of Congress requiring the discovery of the vein before location. It was known at the time of the passage of the law that it had been customary in many districts to make locations and encumber the district records with the location certificates before it was known whether or not the location was made upon any vein. This practice Congress, by the provision in question, stopped. Under this law the locator must discover the vein, or be able to demonstrate that a vein exists

within the limits of his location, which amounts to a " discovery," and must lay out his claim substantially in the form of a parallelogram, along the general course of the vein. (*Mining Co. v. Torbet*, 8 Otto, 463.)

These several elements, to-wit : the form, the direction along the general course of the vein and the discovery of the vein within the limits of the location, as above explained, meet the several calls of the Statute, the grant of right and the theory of the law. To hold to the strict and technical rule that the vein must be actually exposed or the discovery shaft actually sunk upon unappropriated lands when the fact of the existence of the vein within the limits of the location extending along and through the parallelogram can be as effectually demonstrated and discovered just within the lines of a prior location owned by the same party, is doing violence to the liberal construction uniformly put upon the rules, regulations and mining laws. There is nothing in the letter of the law to warrant such a conclusion and it is manifestly against the reason, spirit and intent of the law.

Section 2322 relates to the locator's rights of possession and enjoyment of his claim. It defines the measure of his right. It has nothing to do with various steps necessary to be taken for the purpose of acquiring the right. Nothing in this section conflicts with the theory we have thus far advanced. So far as the proposition which we are now discussing is concerned we urge and insist that because the discovery of the vein happens to be made, or the discovery shaft sunk, within the limits of a prior location, the second location based upon such discovery is not invalid so far as the excess is concerned. As applied to this case that the portion of the " Ophir " claim that extended southeasterly of the " Golden Terra's " southeast end line was and is valid, independent of the question as to the effect of the " Ophir " location upon that portion of the " Terra " included within the boundary lines.

Section 2323 relates to the owners of tunnels and tunnel rights. Section 2324 relates to the rules and regulations of the miners and contains the grant of right to make the same. It also contains certain leading rules to be observed in making locations, and it must be read and construed in connection with section 2320. These

two sections contain all the rules necessary to be observed as prescribed by Congress for making the kind of locations involved in this action.

By the observance of these general rules the locator acquires the possessory right under the law of Congress.    The subsequent sections relate to applications for patents, adverse claims, etc.    The act of the Legislature of Dakota Territory, found on pages 159 to 163, Dakota code.    See *Golden Fleece Co. v. Cable Co.*, 12 Nev., 322, 323 and 325.

" The theory of the defendants is, that the " Ophir " location was and is absolutely void for the reason that its discovery shaft was sunk within the lines of the " Terra " claim.    If that theory be correct the " Ophir " location could never ripen into a title to the ground included within its boundaries.

" To test this question, suppose that only the two locations, the " Ophir " and the " Golden Terra " existed, and that the " Ophir " company after its discovery, location and performance of the requisite amount of labor had applied for a patent for all the ground included within the " Ophir " location.    In such case the law provides, after certain proceedings had, that a patent shall issue if no adverse claim is presented.    Who in this case could present an adverse claim?    Certainly not the persons owning the " Golden Terra " title, for they would be the same persons who are applying for a patent, and their claim so far from being adverse to, would be in themselves.

" Now if the " Ophir " company saw proper to procure a patent under the " Ophir " location, no one could object, and that location would ripen into a perfect title.    The only questions that can possibly arise between the plaintiff as the owner of the " Ophir " and the defendants as the owners of the " Golden Terry Extension," are :

" 1st.    Did the " Ophir " company discover a vein within the limits of its location ?

" 2d.    Did it make a location on the ground, and record a certificate thereof, prior to the claim of the " Golden Terry Extension ?"

" 3d.    Did it perform the necessary labor to hold the claim within the bounds of its location ?"

If these questions are decided in the affirmative, the plaintiff must recover. The defendants do not claim, under the original " Golden Terra" location, but on the contrary whatever title now exists under that location is in the plaintiff, and it would be an absurdity to assert that the defendants in an action of ejectment could set up title in the plaintiff to defeat his action."

The above, in quotation, is taken from the able opinion of ex-Senator Stewart of Nevada, the author of the U. S. Mining Law of 1872, probably the ablest mining lawyer on the Pacific coast. Justice Field refers to him as the author of the act in the case of *Jennison v. Kirk*, 8 Otto, 459. The opinion was prepared for the plaintiff in this action. See in connection with opinion again, sections 2320, 2324, 2325 and 2326, U. S. Mining Law, 1872; " *Eureka Case*," 4 Sawyer, 302, 318 to 326.

III. Again, if the court does not hold with us to the extent claimed in the proposition we have just discussed, we then maintain that the court must hold that the following proposition of law is sound, to-wit: That the location of the " Ophir" claim by the owners of the " Ophir" and " Golden Terra" amounted to a complete and effectual abandonment of so much of the " Terra" as was included within the " Ophir" lines. (Judge Bowen's decision of the District Court at Leadville, Col., in manuscript.)

From the facts found by the Court the above conclusion of law irresistibly follows, notwithstanding the court has also found that the owners of the " Golden Terra" made the new discovery within the lines of the " Ophir" claim, and made the " Ophir" location, without abandoning or intending to abandon any portion of the " Golden Terra."

The locators of the " Ophir," as found by the court, performed every act and fully complied with all the laws, rules and regulations respecting mining claims, in making that location. Whatever secret intention they may have had in their own minds can not affect their grantees. The acts of the locators made the " Ophir" claim a complete, valid mining location. They had the discovery within the limits of the claim located; they put up the proper notice at the discovery shaft; they marked the boundaries as required by law; and they and their grantees had performed

more than one hundred dollars in value of work each year since the date of location. It is therefore entirely immaterial what their intention or purpose was.

The law prescribes what acts shall constitute a location. It does not take into consideration the secret purposes and intentions of the locators so long as all the successive steps are taken required by law to make a valid location.

The above proposition and reasoning apply with equal force to the acts of Bailey and Durbin with respect to the "Ophir" claim on and after the 28th day of February and 1st day of March, 1877. Their work and acts on the days mentioned were a relocation, adoption and re-appropriation of all the veins within its then existing boundaries. Indeed, their first act immediately after the abrogation of the Indian title was an adoption of the claim and their rights thereto at once vested. They and their grantees having at all times since remained in the actual possession of said claim, it is immaterial when the re-location notice was recorded or whether it was ever recorded. Their possession was notice to the defendants and all others.

The record of a mining claim has no greater effect than the records kept pursuant to the registration laws of the respective States, and does not exclude as *prima facie* evidence of title, proof of actual possession and its extent. (*Campbell v. Rankin,* 9 Otto, 261.)

That the act of John W. Bailey and Thomas F. Durbin in causing a re-location certificate of said "Golden Terra" mining claim to be recorded in the records of the Whitewood Quartz Mining District, Lawrence county, Dakota Territory, ont he 13th day of March, A. D. 1877, prior to causing any such record of the "Ophir" mining claim to be made with the recorder of said district, they then claiming to be the owners of both said "Golden Terra" and "Ophir" mining claims, was an election on the part of said Durbin and Bailey to claim said "Golden Terra" mining claim as originally staked and claimed, and to give said "Golden Terra" mining claim priority of right as a mining claim over the said "Ophir" claim subsequent to the 28th day of February, A. D. 1877.

We cannot understand by what process of reasoning the above conclusion can be sustained. If the right and title of Bailey and Durbin to the "Ophir" claim vested by their acts of adoption, immediately after the abrogation of the Indian title, how can it be claimed that the time of recording the location certificate, whether before or after the recording of the "Terra" certificate, can affect the validity of the "Ophir" claim? Rights to mining property are not acquired or lost by the recording or failure to record or time of recording the location certificate as against or in favor of parties having knowledge of the actual possession and location. Bailey and Durbin either acquired a vested right in and to the "Ophir" claim on the 28th day of February, and 1st day of March, 1877, or they did not. If they did acquire such vested right then the above conclusion is entirely immaterial as the manner and time of recording as found in said conclusion would not constitute an abandonment of their interest so acquired. If the question of priority between the "Terra" and the "Ophir" is of any importance it was settled and determined immediately after the abrogation of the Indian title. (*Golden Fleece Co. v. the Cable Co.*, 12 Nev.; *Bell v. Bed Rock* 7, and *M. Co.*, 36 Cal., 214–219; *Campbell v. Rankin*, 9 Otto, 261; Dakota Code, 159–160; Mining rules, pp. 17 to 20, 44 to 46 abstract; 36 Col., 214.

That the act of John W. Bailey and Thomas F. Durbin in causing a survey of the "Golden Terra" and "Ophir" mining claims to be made by Henkle and Helwig on the 16th and 17th days of May A. D. 1877, and causing said claims to be staked according to said survey, was a declaration as to their title and evidence of the intention of said Bailey and Durbin to claim said "Ophir" mining claim as separate from and not embracing within the surface boundaries any portion of said "Golden Terra" mining claim and that as said "Ophir" mine was by said Bailey and Durbin held, claimed, surveyed and staked, it had no discovery within its surface boundaries and was not a valid mining location; this conclusion is founded upon the 24th finding of fact, which finding of fact is, as plaintiff claims, contrary to the evidence as urged heretofore. Upon the question of intention said finding of fact and conclusion of law is relied upon by defendants

as the pivotal point on which this case may turn in this court if a new trial should be here denied.

If the court should hold that the conclusion of law above set forth, was a legitimate deduction from the finding of fact above referred to, and should hold that the alleged "Hencle and Helwig survey, on the 16th and 17th days of May, 1877, was a declaration as to their title and evidence of the intention of said Bailey and Durbin to claim said 'Ophir' mining claim as separate from and not embracing within the surface boundaries any portion of the 'Golden Terra' mining claim," then we submit that this court ought not to hesitate to grant us a new trial and enable us to bring before this court the evidence upon this question for review.

As we stated before, the conclusions of law and said 24th finding of fact must be read and construed together. The effect claimed for both by the respondent is to make the court hold that because Bailey and Durbin on the 16th and 17th days of May, 1877, made the survey in question, that such act (if we should admit such finding of fact to be correct) was a conclusive declaration on their part that they did not claim any portion of the "Ophir" embraced within the "Terra" lines; that such act in effect constituted an abandonment of that portion of the "Ophir" included within the "Terra" lines. It is evident that if the act in question did not amount to an abandonment, then the finding and conclusion are immaterial.

We submit that such an inference, as to intention, does not follow from the facts stated and found by the court. It is inconsistent with all their other acts relating to that claim: all their work upon the "Ophir," according to the finding of the court, was done within that portion of the "Ophir." The original boundary stakes were left standing. In their sale to the plaintiff they described the southerly segregated "Ophir" as now claimed by the plaintiff 850 feet long and 300 feet wide.

All the different findings must be construed together. From them the court was not warranted in finding the declaration of intention contained in said conclusion of law.

But assuming that said act of survey amounted to such a de-

claration, it is immaterial, because all their other acts as we have stated show that they did not intend to abandon any portion of the "Ophir."

The other assignments of error are all insisted upon so far as they can be considered on this appeal. It is unnecessary to discuss them as many of them relate to the insufficiency of the evidence, and the other assignments of error upon conclusions of law grow out of the propositions we have been discussing.

*McLaughlin & Steele*, for defendants.

II. Does the complaint of plaintiff state a cause of action?

Before considering the alleged errors in plaintiff's assignment, it will be well to examine the complaint, and determine whether or not it states facts sufficient to constitute a cause of action. If it does not, the court will be spared the time and labor of further examination.

Every pleading is to be taken most strongly against the pleader. The plaintiff has stated its own case most favorable to itself. Its title is shown to have been deraigned from an unlawful attempt on the part of H. C. Harney, Mose Manuel, Fred. Manuel and Alex Engh, who invaded the Indian reservation to make a location of a mining claim where they were prohibited by treaty and by law from entering. This court has passed upon the right of persons to occupy and settle upon this reservation at least three times, and the question may be treated as settled here: *United States v. McCall*, 1 Dak., 320; *Otto Uhlig v. Garrison; French et al v. Lancaster et. al.*

This court will take judicial notice of the "territorial extent of the jurisdiction and sovereignty, exercised *de facto* by their own government; and of the local divisions of their country, as into States, provinces, counties, cities, towns, local parishes or the like, so far as political government is concerned or affected; and of the relative positions of such local divisions; but not of the precise boundaries, further than they may be described in public statutes." (1 Greenleaf on Evidence, section 6; 1 Wharton on Evidence, section 539.)

The boundaries of the Sioux Indian reservation were fixed in the treaty made with the different tribes of the Sioux nation, which was promulgated by the President, February 24, 1869; and the "Whitewood Quartz Mining District, Lawrence county, Dakota Territory," will be judicially noticed as being within the limits of, and upon that "permanent home of the Indians" until February 28, 1877.

No location or re-location of the pretended "Ophir" claim, is alleged as having been made after the Black Hills country was eliminated from the reservation. Hence, respondents claim that on the face of the complaint, the "Ophir" location is shown to be invalid. Perhaps it will be claimed by appellant that this objection to the sufficiency of the complaint should have been taken in the court below. It was not necessary to do this. If no objection be taken to the complaint by demurrer or answer, for reasons mentioned in section 113, of the Code of Civil Procedure of Dakota, the defendant shall be deemed to have waived the same, except objection to the jurisdiction of the court, and that the complaint does not state facts sufficient to constitute a cause of action. (Section 117. Codes of Dakota, pp. 530.) The objection may be taken at any stage of the case, when upon the uncontradicted allegations of the complaint no cause of action is stated against the defendants. (*Graham v. Camman*, 5 Duer., 697; 13 How., 360; *Richard v. Edick*, 17 Barb., 260; *Prindle v. Carruthers*, 15 N. Y., 425; *People v. Mayor of N. Y.*, 8 Abb., 7; 28 Barb., 240; 17 How., 56; *Roeder v. Ormsby*, 22 How., 270; 13 Abb., 334. But objection was raised to the evidence adduced by plaintiff to sustain the allegations of its complaint. This objection was in the nature of a demurrer *ore tenus*, to the complaint; and upon any other, the court must determine whether the complaint states a cause of action or not. See *Curtis & Co. v. Cutler*, 7 Neb., 315; *Gardner v. McCullough*, 48 Mo., 318; *Rothe v. Rothe*, 31 Wis, 570; *Hays v. Lewis*, 17 id. 217; *Smith v. Weage*, 21 id. 446.

The court are never to presume a cause of action, even after verdict, where none appears in the complaint. (*Wright v. Smith*, 27 Barb., 631.)

Again: The answer of the defendants alleges two locations of

the "Golden Terry Extension" lode—one in August, 1876, and the other by the same parties on March 15th, 1877. The denial in the answer places the *onus probandi* on the plaintiff, of proving a valid location of the alleged "Ophir." The plea of locating the defendant's claim in August '76 is as good as the plaintiff's plea of locating the "Ophir" in June of the same year. Both probably are worthless; but when plaintiff objected to defendant's evidence to show such a location, it also was in the nature of a demurrer *ore tenus*, to that allegation of the answer, and judgment should have gone against the party having the first insufficient pleading. (Record, pp. 13; 1 Saunders Pleading and Evidence, 528; 1 Chitty's Pleading, 663; Gould's Pleading, chap. IX., sections 36–40; *Bolster v. Catterlin*, 10 Indiana, 117; *Stoddard v. Onondaga,* &c., 12 Barbour, 573; *Cook v. Graham*, 3 Cranch, 229; *United States v. Arthur*, 5 Cranch, 251; *Clearwater v. Meredith*, 1 Wallace, 25; *Gorman v. Lenox*, 15 Peters, 115; *Bennett v. Irwin*, 3 Johnson, 366; *Gelston v. Burr*, 12 Johnson, 482; *Leslie v. Harlow*, 18 New Hampshire, 518.)

The only title pleaded in the complaint is that derived from the June, 1876, location of Harney, Manuels and Engh, and their grantees, by purchase.

As the plaintiff (appellant) came into court with its own history of its title, and now comes here with the same recital of the inception of its alleged title and ownership of the alleged "Ophir" lode, the respondents ask the court to first determine the sufficiency of the complaint before proceeding further; to inquire whether any reason exists to question the regularity and legality of the judgment and decree of the court below.

Counsel for respondents particularly desire the attention of the Appellate Court, in addition to what has already been advanced, to the 21st allegation of defendant's answer.

As to the relocation of defendants' mining claim, March 15, 1877, and to the frank admission brought into the record by appellant's counsel, and made a part of the same by the court—at their instance and request, no doubt. It is as follows:

"The defendants to maintain the issues on their part, called as a witness, Wm. S. Storey, and *many other witnesses*, to prove, and

by them offered to prove, all of the acts of possession required by law to make a location of the " Golden Terry Extension " mining claim, in the months of July and August, 1876.  *.  *  *  *  *

"The defendants also offered evidence tending to prove that the locators of the "Golden Terry Extension," Storey and Mahler and their grantees, were, on the 28th day of February, and 1st of March, 1877, *and continuously thereafter working upon and in possession of the alleged " Golden Terry Extension " lode*, developing the same and working thereon, with a discovery, and stakes marking the surface boundaries; and that on the 15th day of March, 1877, the said Storey and Mahler *relocated* said alleged "Golden Terry Extension" lode, by adopting the stakes marking the boundaries as their then boundaries, by posting a new location notice with a supplemental notice annexed, and recording the same on the 15th day of March, 1877, in the office of the proper mining recorder; and on the 21st day of June, 1877, filing and recording with the register of deeds, of Lawrence county, a certificate of location in due form."

The motion for a new trial was not made upon exceptions, or case, but "upon the minutes of the court," and upon affidavits, setting forth the destruction of the papers in the case, and about 5,000 pages of the stenographer's notes, by fire; and it is gravely contended by plaintiff's counsel that it was error in the court to render its decision after such destruction, although neither party took any steps to reproduce the depositions, exhibits, or oral evidence, nor suggested to the court that the same was proper or necessary, until after the decision was rendered.

V.   The first alleged error, and we think the only one deserving of much consideration, is:  " That the Court erred in overruling and denying plaintiff's motion for a new trial herein," because of "the destruction by fire, without fault of plaintiff of the records, depositions, exhibits and all the oral evidence taken in the case," in the fire that consumed the town of Deadwood, September 26, 1879.   Since the defendants are not charged with any blame, it would have been quite proper to have said, *without fault of the parties hereto*, instead of merely naming plaintiff as blameless for the calamity.

The case had been well and ably tried on the part of the plaintiff by eminent counsel, and was submitted to the court for its decision, together with proposed findings of fact and conclusions of law prepared by each side. The oral evidence had all been heard, the reading of the depositions listened to, and all the exhibits examined by the court. What else remained to be done by either side? Nothing. And nothing remained for the court but to render its decision.

A mass of stenographer's notes was taken for the convenience of counsel, but not under any requirement of the law. If counsel neglected to take notes or memoranda during the progress of the trial, that is of no moment now, and this court has no concern about their neglect in that regard.

The "accident" or "surprise" which authorizes the court to grant a new trial, is such as prevents the party from having a fair trial of his cause, such as where a material witness who has been duly subpœnaed absents himself at the moment of trial so that the party cannot avail himself of the benefit of his testimony. (*Tilden v. Gardanier*, 25 Wend., 663; *Ruggles v. Hall*, 14 Johns., 112.) No accident or surprise occurred during the trial that there is any complaint of.

Since appellant insists that the records, all the depositions, exhibits, and all the oral evidence in the case, were destroyed and cannot be reproduced, why does it want a new trial? The missing evidence could be produced after the decision as readily as it can be on a new trial, and the court offered plaintiff every facility to produce it.

Surprise arising after verdict is not ground for a new trial. (*People v. Mack*, 2 Parks (N. Y.) Cr., 673.) Mere surprise at the result of a trial cannot entitle the party so surprised to a new trial. (*Lane v. Brown*, 22 Ind., 239.) It is a general rule that a plaintiff after a verdict against him can have no new trial on account of his having been surprised by the defendants' evidence. (*Larrimore v. Williams*, 30 Ind., 18.) This was not a chancery suit, but a legal action brought under chapter 29 of the Code of Civil Procedure, and the manner of trial is prescribed by the Code, as well as what constitutes the record in the case. (Code Civil Procedure, § 299.)

This action tested by the former English system would be deemed ejectment, as it alleges an unlawful entry by defendants into certain mining premises, under a claim of right, their occupancy of the same, and the commission of waste. The evidence in such a case is no part of the record, and could only be brought into it after verdict or decision. The Supreme Court of the United States has definitely settled this in the case of *Balt. & Pot. R. R. Co. v. Trustees, etc.*, 1 Otto, 130, where they say : "Neither depositions nor affidavits, though appearing in the transcript of a common law court of errors can ever be regarded as a part of the record, unless the same is embodied in an agreed statement of facts, or are made so by a demurrer to the evidence, or are exhibited in a bill of exceptions."

" Matters of parol evidence in such a case can never be made a part of the record so as to be re-examinable in a court of error, unless it be in one of four ways :

" 1.   By an agreed statement of facts.

" 2.   By a bill of exceptions.

" 3.   By a special verdict.

" 4.   By a demurrer to the evidence, which latter mode is seldom or never adopted in modern practice."

" Judicial records are a history of the proceedings of courts. * * Thus the record imports a history of the cause from its commencement—from the issuance of process to final judgment. It embraces the successive judicial steps which have been taken and are necessary to show jurisdiction and regularity of procedure, the process, writ or summons, with proof of service ; the pleadings, minutes of trial and verdict—if a jury case ; exhibits and proofs, if an equity cause, etc. (2 Abbott's Law Dictionary.) Freeman on Judgments, treats of the " record " or " judgment roll," the " judgment roll or record," and uses the terms as inter-changeable and synonymous. (*Vide*, Freeman on Judgment, § 75.) In chancery causes, the evidence must be preserved in the record, and this may be done by its being reduced to writing, by the master or by any one else under the *direction* of the court ; or, it may be embodied in the decree." (*Eaton v. Saunders*, 43 Ills., 436 ; *Eaton v. Warren*, 43 id. 437 ; *Hughs v. Washington*, 65 Ills., 245.) The transcript of the

record of every case brought to this court, is merely a certified copy of the judgment roll. (Section 408, Code Civil Procedure.)

The "record" or judgment roll in this case was not completed, as the case had not proceeded far enough, at the time of the fire. Issue had been joined by the pleadings, a trial had before the court on the evidence, and the cause submitted to it. No findings, no decision, no judgment, but the court heard all the evidence, had its own recollection of its pertinency, potency and value; saw the witnesses on the stand, noticed their demeanor, and the interest each manifested in the result of the action; and what need, pray, did it, or would it have to wade through the 5,000 and odd pages of the stenographer's notes, the depositions and exhibits to a proper determination of the case?

The chancellor in equity cases, in order to make a decree, had to adopt the conclusions of the master or examine the evidence for himself, which had been taken and filed in the case. But where is the analogy between that practice and this under the Code? While the principles of equity remain, and always will remain distinct from legal ones, both are now pursued under the Code of Civil Procedure.

No "record" or judgment roll could be made up in this case, until the final or judgment order was signed, when the necessary papers would be attached together by the clerk and the judgment roll constituted.

Copies of the pleadings prepared by the plaintiff, were at the time of the fire, in the possession of the court; and by stipulation of the respective parties were substituted for the originals. A very large portion of the evidence collated on the material points, by defendant's counsel, was also with the court and was saved from destruction, as appears in the printed record.

"If the record or judgment roll itself was destroyed it could be replaced." (Code Civil Proc. section 525; Freeman on Judgments, sections 63, 89, 407.

While it might be tedious and difficult for counsel to reproduce, *verbatim*, the oral and written testimony and the exhibits in the case, as they were preserved in the stenographer's notes, it was not

and is not impossible for counsel for appellant to make a case or bill of exceptions substantially embodying them, or as much as was necessary. They have done the very thing that they insisted in the court below that they could not do; and have prepared a bill of exceptions, (section 279 Code) and they have the same brought into the record by order of the court.

The destruction of the stenographer's notes of the testimony, did not destroy the oral evidence; at least there is no proof that such is the fact. Nearly all of plaintiff's witnesses are still alive, and can tell their respective tales, if not in terms as told before, at least in substance. That this would entail expense and great labor, respondents do not deny; but aver it would be gross injustice to shift a misfortune from the shoulders of one innocent person, where a public calamity chanced to place it, to those of another person equally as innocent. It would be strange equity to do this. (7 Howard (Miss.) 95; *Eaton v. Saunders*, 43 Ill., 436; *Hughes v. Washington*, 65 id. 245.)

The destruction of the depositions, exhibits and notes of the oral testimony, was not caused by any irregularity of the prevailing party, or any error of court, and cannot properly be made the basis of a new trial.

No power exists to grant a new trial except for the statutory grounds mentioned in section 286, and to grant it for the loss of the record would be error, as it can be substituted.

There are only three grounds upon which the court may entertain a motion for a new trial, upon its own minutes, to set aside a verdict and to grant a new trial, viz: 1. Upon exceptions; 2, for insufficient evidence; 3, for excessive damage. *Tinson v. Welch*, 7 Rob., 392; *Moore v. Wood*, 19 How., 405; *Algeo v. Duncan*, 39 N. Y., 313; *McDonald v. Walter*, 40 N. Y., 551.) In this case the motion for a new trial is made upon the minutes of the court, but not upon any of the foregoing grounds.

The array of the alleged errors, based on what is termed the insufficiency of the evidence to justify the findings, may be passed by with the remark that since the plaintiff has seen proper to avoid incorporating the evidence on any one of these findings,

in the record, this court cannot determine that the evidence was insufficient. Every presumption is in favor of the sufficiency of the evidence to sustain and support the findings.

The further objection might with propriety be made, if the record contained the evidence, that none of the seventeen exceptions to the court's findings of fact, on the score that the evidence was insufficient to justify the findings, points out in what particular the evidence is alleged to be insufficient. (Code, section 280.)

While under the second sub-division of section 119 of the Code the defendant is not restricted to setting forth by answer as many consistent defenses as he may have, but merely as many defenses as he may have, the plaintiff has no such latitude of inconsistency accorded to him. He could not proceed on several inconsistent causes of action very far until he was halted.

The plaintiff has declared upon an invalid location, and its proof corresponded with its allegation. May it now seriously complain of the conclusions of the court, that upon the pleadings and the proofs in the case (the Indian reservation question aside) that the "Ophir" was not a valid location in 1876, because of its being within the "Golden Terra" location? and that its so-called discovery shaft was only an exposure and development of the "Golden Terra" lode, a valid subsisting mining claim? Notwithstanding that the court declined to pass upon the question of validity or invalidity of a mining claim made in the Black Hills prior to February 28th, 1877, it admitted proof of such locations to show, when properly connected, the existence of facts on and after February 28th, 1877, essential to a valid mining location.

Therefore since the plaintiff pleaded and proved an invalid mining location—invalid because made upon an Indian reservation, and invalid because attempted to be made within the limits of a prior location, does it now lie in its mouth to charge the court with error, in doing what it had invoked the court to do? It called upon it to receive evidence of acts of location of the "Ophir" lode in 1876 despite the objection of defendants; and now claims that the consideration of similar evidence in the case,

for and on behalf of the defendants, was error, and prays for a reversal.

We do not understand that the plaintiff may complain of what it invited the Court to do, and take advantage of a mistake or error committed at its request. We think good faith is required in dealing with courts. Whether it is or not, the party causing the mistake or error in the first instance, (if any there be) should be held to suffer any ill consequence resulting.

The first conclusion of law is supported by reason and authority. The reason of the Court is given in full to support the finding. See following authorities: U. S. Rev. St., 2322; *Chapman v. Toy Long*, 4 Saw. C. C., 28; *Eureka Case*, id. 302.

The first locator of a mining claim, so long as he complies with the law, becomes vested with the right to the exclusive possession and enjoyment of all the surface ground within the limits of his location, and to all veins or lodes the top or apex of which come up within his side lines. The paramount title may be in the government, yet in the case above cited, *Chapman v. Toy Long*, the Court decide that the miners' title "is full and complete." This is as true of the undeveloped as of the developed portion of the mine. What else remains in the location to be acquired by subsequently repeating the acts of location while the first is subsisting? It would be trespass for another party to go within the surface lines of the first, in any case, except when a cross vein exists. To make a so-called discovery and location within the surface lines of the first, would be invading the possession of him, who, so long as he complied with the law, was entitled to the exclusive right of "possession and enjoyment" of all the surface included within his claim. In the case of cross veins (§ 2336, U. S. Rev. St.) only a naked easement—"right of way through the space of intersection," is granted to the locator of the cross vein. The discovery of the cross vein must be made outside of the prior location, as it is entitled to all ore or mineral within the space of intersection.

As well could two material bodies occupy the same space at the same moment of time, as for two equal, valid, subsisting mining claims to cover the same ground at the same time; and if two, why not three, or four, or more exist?

The "Golden Terra" location was in point of time and importance the prior location, both before and after February 28, 1877; was always claimed as a valid subsisting mining claim by the locators and their grantees; and when surveyed and restaked in May, 1877, by Henckle & Helwig had all the workings including the pretended "Ophir" discovery within its limits; while the "Ophir"—surveyed subsequently, was staked and its boundaries were entirely outside of the "Golden Terra" claim.

The decision of the court was reached after a patient, laborious research and careful consideration, after a long and impartial trial in which thirty-eight witnesses were sworn and examined on the part of the plaintiff, and forty-seven on the part of defendants. There can be no sort of doubt that the Court's decision would have been the same if all the papers and notes of evidence in the case were at his Honor's elbow when it was rendered; and that it was the decision rather than the loss of the papers by fire that surprised and disappointed plaintiff's counsel. Had the decision been in favor of plaintiff we think its counsel would have exhibited admiration for the regularity and orderly course of the proceedings of the court, and insisted upon judgment being entered thereon with serenity and composure. The judgment of the court below should be affirmed.

MOODY, J.—This action was brought by the plaintiff in the District Court of Lawrence county, to determine the rights of the parties claiming adversely about two hundred feet by one hundred and fifty feet of mining ground situate in Whitewood Quartz Mining district in said county.

The plaintiff claims ownership of the ground in controversy by virtue of what is known as the "Ophir" mining claim, and the defendants claim such ownership by virtue of their "Golden Terry Extension" mining claim, these two mining claims overlapping and conflicting with each other to that extent.

This ground is alleged to be very valuable for the gold-bearing ores therein, and has given rise to much and costly litigation.

The plaintiff brings the action in the nature of an action to

quiet the title and for an injunction, alleging also in its complaint that the defendants have unlawfully entered into the disputed ground by means of a tunnel commenced within the plaintiff's "Ophir" mining claim, and without plaintiff's consent have extracted and carried away large quantities of valuable gold-bearing ores therefrom, and are continuing to extract and take away such ores to plaintiff's great damage.

The plaintiff derives title to the ground by transfers coming down to it from the locators of the "Ophir"—H. C. Harney and others—who, the complaint alleges, made a location of such mining claim on the 7th day of June, 1876,—the complaint further alleging that the plaintiff and its grantors have ever since said location been in the lawful possession of said "Ophir" claim.

The defendants, in substance, deny the validity of the "Ophir" location so far as it affects the ground in controversy, alleging several reasons for the invalidity, among which are, that it was located, while that portion of the Territory within which it is situated, was a part of the Great Sioux Indian Reservation; as such reservation was defined and set apart for the exclusive use of the Sioux Nation of Indians, by the treaty with the several bands of that nation; and that it was predicated upon a discovery made wholly within the boundaries of another valid and subsisting prior mining location, no part of which has ever been abandoned.

The defendants also deny that the plaintiff or its grantors have ever been in the possession of any portion of the disputed property, until shortly before the commencement of the action when the plaintiff's employes run a tunnel from its "Golden Terra" claim into the ore body found in this ground and underneath the defendants' workings.

They further allege facts constituting an equitable estoppel against the plaintiff's claiming this disputed property, and that they have been in the quiet and undisputed possession of the same, expending large sums in the development thereof, ever since the 28th of February, 1877, when the Indian title thereto became extinguished, until the plaintiff's interference by means of the tunnel before spoken of.

Other facts are alleged in the pleadings not necessary here to recite.

The trial was to the court, a jury being waived as to such issues as were properly triable to a jury, and a decision and judgment was rendered and entered for defendants, and plaintiff appeals.

A motion was made by plaintiff in the District Court for a new trial and overruled, and upon this action of the court arises the first and most important alleged error. The most important because if the action of the court in denying a new trial was right then as will hereafter be made to appear, the record contains nothing which will entitle the plaintiff to a reversal of the judgment.

In order to a proper understanding of the points involved in those grounds for such motion most strenuously urged here it is necessary to recite somewhat the history of the trial of the action and the facts bearing upon the motion in their chronological order.

The trial commenced on the seventh day of July, 1879, was concluded and finally submitted together with each parties' proposed findings of fact to the court, on the second day of August, 1879. On September 26th following occurred the fire in Deadwood, hereinafter spoken of, at which it is alleged were destroyed the stenographer's notes taken at the trial and the transcripts therefrom held by counsel. On the 6th of December the judge signed and filed his decision containing the findings of fact and conclusions of law. On December 30th plaintiff's attorneys filed the motion for a new trial which was heard January 29, 1880, taken under advisement and decided February 2d, 1880. By stipulation of the parties the court extended the time for preparing and settling the bill of exceptions or case from time to time until March 1st, 1881, and on February 28th, 1881, the bill of exceptions as it appears in the record was finally settled and signed, there having elapsed one year and five months from the time of the Deadwood fire until the record was fully completed. These facts will be seen to be important when we come to consider the reasons urged for a new trial of the action.

The motion for a new trial is made upon *the minutes of the court* and accompanying affidavits in support of the first and second grounds or reasons, set forth and alleges the following reasons for the motion:

*First*—" Irregularity in the proceedings of the court. Because the court rendered its decision after the destruction by fire, without the fault of plaintiff, of the records, all the depositions, exhibits, and all the oral evidence taken in said cause.

" II.—Accident which ordinary prudence could not have guarded against.

" 1st.—That after the conclusion of the evidence, argument of counsel and the submis sion of said cause to the court and before said decision was rendered, the records, all the depositions, exhibits in said action, and all the oral evidence taken on the trial of said action were des troyed by fire, without the fault of plaintiff, to-wit: by fire t hat destroyed the principal part of Deadwood on September 26th, 1879, as will more fully appear by the annexed affidavits.

" 2nd.—That by the destruction of said records and evidence the plaintiff is deprived of a review of the findings of fact and conclusions of law by this court and by the appellate court, to the great and irreparable injury of said plaintiff."

Then foll ows other reasons, to-wit: insufficiency of the evidence to sustain certain findings of fact; that the decision of the court is against law; that certain conclusions of law are against law; error in law occurring at the trial, specifying such error, and that the court erred in law in not finding certain facts requested by plaintiff.

Accompanying th is motion are affidavits alleging the destruction by the fire of September 26th, 1879, of the pleadings, of the notes of the testimony taken by the stenographers, of the transcript therefrom in counsel's possession, of a number of exhibits, and a number of important depositions.

The attorneys for the defendants presented and filed a counter affidavit stating, in substance, that copies of the pleadings had been preserved and substituted for the originals; that a large amount of the testimony on the material points in the case which had been briefed from the transcript of the stenographer's had also been preserved and was then with the clerk, and that it was entirely practicable to make a complete and accurate case, or bill of exceptions, with the aids at hand.

Golden Terra Mining Co. v. Smith et al

Upon this motion the judge rendered a decision, in writing, which, as it found upon the disputed facts involved in the motion, was incorporated into the bill of exceptions and brought to this court, in which, after reciting the grounds of the motion, the judge says, upon the subject of the alleged destruction of the papers: "The argument upon this motion has been confined to the causes stated in the 1st and 2d grounds above given. Those causes I propose briefly to review:

"1st. As to the alleged irregularity in the proceedings of the court, in rendering a decision after the occurrence of the fire, at which the stenographer's notes, the transcripts therefrom furnished the counsel for the respective parties, and the original pleadings were destroyed; the facts are these: I had a copy of the pleadings furnished by the plaintiff for the court in pursuance of the statutes. A large part of the testimony compiled from the stenographer's transcript, relating to all those subjects I demand as material to the just determination of the case, my own memorandas, and the findings prepared and submitted by each party. These were preserved, and, as stated in defendant's affidavit opposing this motion, the copies of pleadings have been since substituted for and made originals, and the testimony and findings, together with the plats and exhibits thereto attached, have been placed with, and are now with, the clerk of this court. The record proper, to-wit: the pleadings, minutes of the trial and decision being now complete.

"Again. The fire occurred on the morning of the 26th of September. My decision was not filed until December 6th. In the meantime, save about three weeks, during which I was absent attending the Supreme Court at Yankton, the court was constantly daily open for the transaction of business, notwithstanding which no motion was made relative to the subject, and no suggestion ever reached me of the propriety of postponing the decision until the evidence could be retaken or substituted. Certainly the amplest opportunity was afforded, and if such a course had been deemed advisable by plaintiff's counsel they should have moved the Court to that effect, or in some way called the Court's attention to the necessity or propriety of reproducing the evidence in all its details and minuteness before the decision was filed."

The Judge, in his decision upon the motion, says further:

" A large mass of the oral, and at least a part of the documentary, evidence, has been preserved.   As much of the destroyed oral and documentary evidence as could be had in a new trial, can be reproduced and put into the bill of exceptions or case.   It may be difficult and involve much labor, but it is not impossible.   I see no difficulty in counsel bringing before them their witnesses in instances where the testimony or its substantial parts have escaped them, and learn what in substance such witnesses did testify to. I believe copies of all the necessary documentary evidence are already with the clerk, among the findings and evidence returned to him.   The power of the Court is sufficient to afford the needed time, and if there is any doubt upon that subject defendants' counsel have already in open court offered to stipulate, which offer the Court will enforce, if necessary.

" Therefore I have concluded that the just and proper remedy— just to the defendants as well as the plaintiff, is not by granting a new trial but by allowing plaintiff time and affording facilities for bringing all the evidence upon the record it desires to incorporate into the bill or case, and I have drawn an order to that effect."   *    *    *.

Thereupon the following order was entered :

" The motion to vacate the findings and decision of the Court, and for a new trial in this action coming on for hearing and argument by the counsel for the respective parties, and upon consideration thereof, it is by the Court on this 2d day of February, A. D. 1880, ordered that the said motion of plaintiff be and the same is overruled and denied.

" And in consideration of the facts stated in support of said motion it is further ordered that all proceedings herein, except the entry of judgment, be stayed for the period of sixty days, to enable the plaintiff to prepare and have settled a statement of case or bill of exceptions, and plaintiff is given sixty days time from this date for that purpose.

" It is further ordered that if plaintiff shall be so advised and shall desire, it may have and subpœnaes are directed to issue from this court for such witnesses as may be by the respective

counsel designated to attend for examination upon the Court or Judge thereof, or a referee, to be appointed by the Court, to enable said plaintiff to prepare and have settled a case, or bill of exceptions, according to the truth of the matter, due notice being given of the time and place of such examination to opposite counsel."

The only objection urged by plaintiff in this court against the decision of the District Court upon the motion for a new trial, relates to the alleged irregularity in rendering the decision of the Court after the fire, without a restoration of the minutes of the testimony, etc., and to the destruction thereof.

That portion of the motion based upon the minutes of the Court is not now presented, and, of course, could not be considered, no portion of the evidence, except such as pertains to certain exceptions therein being found in the transcript.

In arriving at a correct determination of the question involved in the decision of the District Court denying a new trial, it will require consideration of the practice prescribed by the Statutes of this Territory in actions of the character of the one before us.

Our practice act, adopted originally at the Legislative session of 1867–8, has met with the approval of Congress, and has been expressly affirmed and constituted the governing practice in suits in equity as well as in actions at law.

We are, therefore, not now embarrassed by any doubt regarding the power of the Legislature under the Organic act to provide one uniform mode of procedure for both classes of actions.

As is well known the Practice act, called the Code of Civil Procedure, was adopted from and largely modeled after the Code of Procedure of New York, with certain modifications necessary to adopt it to our system of courts, and with other amendments suggested by the legislation of California, where a similar Code is in force, and our own experience.

This Code undertakes to and does abolish all distinction in the modes of procedure between actions at law and suits in equity, preserving, however, the right of trial in each to its appropriate tribunal, to-wit: to a jury and to the Court.    All are now called civil actions.    A motion for a new trial is as requisite in an equity

case as in an action at law. The same form is required in preserving the exceptions, in making up a bill of exceptions or statement of the case, and in bringing the evidence into the record in what was heretofore denominated a suit in equity as in an action at law. In an equity case no more than in an action at law does the evidence adduced upon the trial form any part of the record unless made so by bill of exceptions or statement, nor is such evidence at all requisite as a support to the decree or judgment.

The record proper in an action tried upon issues of fact consists of the summons; the pleadings; the verdict, if tried to a jury; the decision, if tried to the Court; and the judgment. All other proceedings, including the evidence, must be brought into the record, if at all, by bill of exceptions or statement of the case, settled and signed by the Judge who tried the action, or settled by this court as pointed out in the Code.

This question thus presented to us is then not one involving a necessity for having the evidence in the record as a support to the decree, and is in no way analogous to the questions presented in those cases called to our attention (notably *Hughes v. Washington*, 65 Ills. 245) occurring in courts which still adhere to a practice in equity cases similar to the chancery practice proper. But it is a question rather whether the plaintiff has had reasonable opportunity to prepare and present its bill of exceptions, and more nearly resembles the questions arising in those cases where bills of exception have been lost or prevented from being settled, and signed by reason of the Judge, trying the cause, going out of office, or having died, contingencies provided for by our Statute.

The complaint is, upon which greatest stress is laid, that the stenographer's notes are lost.

While the law authorizes the District Courts in their discretion to appoint stenographers, and provides for their compensation, it does not in any way make their notes in civil cases official, nor is there any mode for the authentication of them, or of the transcripts therefrom, other than by the mode for the authentication of evidence taken in any other manner or by any other person, to-wit: by the signature of the judge to the bill of exceptions, or case, in which they, or such parts as are necessary to the bill, are incorporated.

Whatever the stenographer may note down as the testimony of a witness, or as evidence received, or proceedings had, has no more binding force, either upon the parties, or the judge who settles the exceptions, than notes taken by any one else.   The law simply provides this as a convenient mode at the request of a party, of taking in civil cases full notes of what occurs at the trial, and does not impede any party in taking his own notes.   After all, the judge, in case of contention, must settle the exceptions according to his own recollection, aided, if he can be, by his own notes, and, possibly by the stenographer's.

No complaint is made to us by the plaintiff of the loss of any exception, save those to the decision of the court upon the facts, to-wit: because of the alleged insufficiency of the evidence to justify the findings of certain of the facts specified in its motion for a new trial, and because of the failu re of the court to find certain facts requested of the court by plaintiff to be, found, and which are named in the motion.

By the rules prescribed by the Statute, the rules of the court and our decisions, these exceptions do not require and do not admit of the setting out of the testimony in full and at length in the bill.

Section 279, Code of Civil Procedure, provides:  "The objection must be stated with so much of the evidence as is necessary to explain it; *and no more.*   When the exception is to the verdict or decision upon the grounds of the insufficiency of the evidence to sustain it, the objection *must specify the particulars* in which such evidence is alleged to be insufficient."

We have endeavored in repeated instances to enforce this wholesome rule, and if the evidence was here in mass and in minuteness as it is desired, we should be compelled to disregard these exceptions for want of compliance therewith.

It seems that notwithstanding the decision was not made and filed until December 6th, some two months and ten days after the destruction by fire of the stenographer's notes, no steps were taken by the plaintiff to reproduce the testimony or to call the court's attention to the loss, and no mention is made of any wish to have it reproduced until the motion for a new trial, December 30th,

and then the plaintiff chose to base its motion upon the minutes of the court. Upon a motion thus based there was no necessity for a reproduction of the testimony or for the use of the stenographer's notes if they had been in existence, although they perhaps might and no doubt would have been convenient to counsel; the reliance however in such case being upon the memory of the judge, assisted by such memorandum as he may have made.

It is optional with a defeated party to first prepare his bill of exceptions or statement of the case, have it settled and signed and move for a new trial upon it or he may move upon the minutes of the court. The plaintiff could have asked, after counsel found the decision adverse, for time to make, have settled and signed a bill of exceptions or case before moving for a new trial, and then if it had been refused such reasonable time as was proper, under the circumstances, might have had some cause to complain, although from the liberality displayed in extending the time after the motion, which was a year and two months and as long as requested, it cannot be doubted sufficient time would have been allowed by the District Court.

Counsel preferred, however, to rely upon the grounds stated in the motion rather than to make any effort in the direction of reproducing the destroyed evidence. They could have at least tried to do so and thus demonstrated its practicability or impracticability.

We see no impossibility or impracticability in the way of their making up, with the aid of so much as was preserved, and tendering a bill containing all the evidence needed, as they alleged it to be. By doing this their adversaries would have been compelled for their own protection to propose such amendments as they alleged were pertinent, and this bill thus tendered, with the proposed amendments when presented to the judge would have enabled him to satisfactorily determine whether a bill could be or not correctly settled according to the truth of the matter, and it is possible if this had been done preparatory to making the motion for a new trial with a view to make it the basis of the motion and it was found impracticable, the judge for that reason would have granted a new trial. But nothing of the kind was done or attempted.

The magnitude of the labor involved can furnish no excuse for not making the attempt and cannot justify this court in establishing the precedent here asked to be established.   Our Statute gives ample power to the judge in settling a bill of exceptions and to parties in preparing one.   Depositions could have been retaken, witnesses could have been called before the judge or a referee for the purpose.   They could have been compelled to testify and it cannot be presumed they would testify differently from their testimony upon the trial.

These and many other reasons can be urged showing why it was not impracticable to make and have settled as elaborate and complete a bill of exceptions or case as the plaintiff may have desired.

We cannot say it was error for the District Court to refuse a new trial simply upon the plaintiff's alleging it was impracticable to restore the evidence, no effort whatever being made in that direction, so far as is shown in the transcript brought to this court.

A reasonable discretion must be accorded the District Courts in the determination of motions of this character.   A District Judge has better opportunity than this court of knowing the good faith or the want of it of the parties making such motions, and whether the loss of important evidence is or is not irreparable without awarding a new trial, and conceding that under our Statute a new trial is a right, demandable and not discretionary in any sense when manifest error prejudicial to the party has been committed upon the trial, still this is not inconsistent with the rule of reasonable discretion in the determination of motions based upon the grounds urged in this case.

The plaintiff has no legal cause of complaint.   No right was denied the plaintiff which the law gave it, or which it could reasonably ask.   The amplest time was given and every facility afforded for reproducing upon paper the evidence, which was not already with the papers in the case and the clerk.   Indeed this court has no means of determining that all that was proper to show the pertinency of the plaintiff's objection to the decision was not fully preserved.

We cannot transfer a misfortune which has overtaken the plain-

tiff—if a misfortune has occurred to it in the loss complained of—to the defendants who are equally without fault, at least until it is satisfactorily demonstrated that such misfortune cannot otherwise be remedied, and assuredly it is not so demonstrated in the record before us.

We therefore conclude the District Court committed no error in overruling the motion for a new trial, so far as it was predicated upon the alleged loss of the notes of the trial.   The other reasons are not urged and cannot well be, as they are not founded upon any objections which are saved, except that the conclusions of law in the decision are not good law.   As to that it was not questioned upon the argument, and we find nothing to induce us to hold that the conclusions are not properly deducable from and fully sustained by the findings.   On the contrary we think they are.

No evidence having been brought into the record, we cannot, of course, review the findings of fact objected to, but must in accordance with the universal rule presume them to be right.

Having disposed of these questions their appeal is virtually disposed of.   But there are exceptions in the transcript which we deem it proper to notice more fully than we have done in considering the questions relating to the motion for a new trial.

Evidence was received upon the trial against the plaintiff's objection tending to prove acts of location of the defendants' mining claim, and of acts and declarations in support of the defendants' plea of estoppel, done and uttered prior to February 28, 1877, the date of the abrogation of the Indian reservation in which these lands were included.

The action was tried before the decision of this court in the case of *French et al v. Lancaster et al*, not yet reported, in which it was held that no title could be acquired to mining ground situated upon the Sioux Indian Reservation by any acts of location performed while such reservation existed, and that such reservation included all of the Black Hills in this Territory, and existed until February 28, 1877.

To that decision we adhere.   By two other decisions—one in *United States v. McCall*, and the other *Uhlig v. Garrison*, we have held, the reservation included the Black Hills country, and in the

last above named that no title could be held or transferred by or between parties, being thereon in violation of the treaty under which such reservation was created.

An examination of the record, however, discloses the fact that the plaintiff first sought and obtained the ruling of the Court in its favor upon this very question.   That against the defendants' objection, evidence was offered and received tending to prove the location of the " Ophir " claim by acts done prior to said date, in support of the issue tendered in plaintiff's complaint of the location of the said " Ophir," on the 7th of June, 1876.    The court in its rulings admitting this evidence at the instance of the plaintiff as in admitting the defendants' evidence of such prior acts, did not undertake to pass upon the question of the validity of a mining location made upon this Indian Reservation, but placed the admission upon two grounds consistent with the subsequent decision of this court in *French v. Lancaster :*    *First.*   To the end that if it should finally be determined that a valid mining location could be there made prior to the 28th of February, 1877, all the evidence and the findings thereon would be in the record for the inspection of the Appellate Court; and, *second,* as such evidence would tend to establish, when properly connected by proof of subsequent claim and possession, the existence of facts on and after February 28, 1877, essential to a valid mining location : for instance, that a disovery of a vein of gold-bearing ore had been made within the limits of the claim ; that the boundaries were distinctly marked on the ground at and after such date by their remaining stakes marking such boundaries placed prior to such date, and other facts.

This was not in any respect prejudicial to the plaintiff for several reasons.   By the allegations in the complaint plaintiff derives its title solely from an attempted location of the " Ophir " made, it will be observed, in June, 1876.   Beside in the findings the Judge has made a clear distinction between acts done prior to and subsequent to February 28, 1877, and has found that on the 28th of February, 1877, the defendants were in the exclusive possession of the mining ground in controversy with the requisite discovery of a vein of valuable minerals thereon, and that they shortly there-

after performed every act necessary to constitute a valid location, and have ever since remained in possession, complying with the laws of Congress, the local laws, rules and regulations, to entitle them to maintain their possessory right thereto.

We do not intend now to detract, in any degree, from the effect of our decision concerning the invalidity of attempted acts of location of a mining claim upon the Sioux reservation, done prior to the date before spoken of, and we decline to consider the question of estoppel, or any other question founded upon declarations, or acts, which can neither create a right nor be the means of transferring one; but the views we entertain lead us to the conclusion that all evidence of such acts and declarations was immaterial, and also harmless; for the findings upon the facts, and acts of location and appropriation which occurred and were done by the defendants, and their grantors, subsequent to the 28th of February, 1877, abundantly support the conclusions of law and the judgment of the District Court, striking out and eliminating altogether from the findings and decision all that relates to matters prior to that date.

The judgment of the District Court is        AFFIRMED.

All the Justices concurring.